[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15691

_____

D.C. Docket No. 5:13-cv-00194-MTT

ROBERT EARL BUTTS,

Petitioner-Appellant,

versus

GDCP WARDEN,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(March 9, 2017)

Before ED CARNES, Chief Judge, TJOFLAT and HULL, Circuit Judges.

ED CARNES, Chief Judge:

Robert Earl Butts, Jr., a Georgia prisoner, murdered Donovan Corey Parks.

Butts was sentenced to death after a jury found him guilty of malice murder, armed

robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-off shotgun. The district court denied his 28 U.S.C. § 2254 petition for a writ of habeas corpus, in which he raised a number of claims challenging his convictions and sentence. The court granted him a certificate of appealability on the question whether "[t]rial and appellate counsel were ineffective for failing to investigate, develop, and present mitigating evidence during the sentencing phase of Butts's trial."

A complicating factor in considering the issues certified for this appeal is the fact that in the state collateral proceeding the trial court ruled that Butts had procedurally defaulted a part of his claim that trial counsel was ineffective for failing to investigate, develop, and present mitigating evidence. During the unified appeal, Butts' new counsel had argued only that trial counsel was ineffective for failing to offer testimony by family members, who could have made a plea for mercy, at the sentencing phase of his trial.[1]

In his later state habeas petition Butts, represented by yet another set of new counsel, reiterated his claim about trial counsel's failure to call family members to plead for mercy, but he also attempted to expand his claim to allege that trial counsel had "failed to conduct an adequate pretrial investigation into [his] family

---

[1] Georgia's Unified Appeal Procedure requires a capital defendant to challenge "the effectiveness of trial counsel . . . in a motion for new trial" and "if the defendant fails to raise an ineffective assistance claim in a motion for new trial, such a claim is deemed waived in all further proceedings." Williams v. Turpin, 87 F.3d 1204, 1210 (11th Cir. 1996).

2

life and background to uncover and present to the jury evidence in mitigation."

The state trial court found that Butts' failure to preserve that expanded part of his

claim during the unified appeal barred it from considering that part of the claim on

the merits.  The court denied the claim based on that procedural bar.  It also denied,

on the merits, Butts' related claim that appellate counsel had rendered ineffective

assistance by failing to adequately raise and preserve during the unified appeal the

trial counsel ineffectiveness claim.  The Georgia Supreme Court denied Butts a

certificate of probable cause to appeal the state trial court's decision denying him

habeas relief.

Butts then filed in federal district court a petition for a writ of habeas corpus.

With limited exceptions, "[w]hen a state court denies a claim as defaulted based on

an adequate and independent state procedural rule, a petitioner may not bring the

claim in federal habeas."  Lucas v. Warden, Ga. Diagnostic & Classification

Prison, 771 F.3d 785, 801 (11th Cir. 2014).  One exception occurs when the habeas

petitioner can show cause and prejudice.  Id.; Jones v. Campbell, 436 F.3d 1285,

1304 (11th Cir. 2006).  In an attempt to lift the procedural bar and have the district

court decide his expanded trial counsel ineffectiveness claim on the merits, Butts

asserted as cause a claim that his appellate counsel was himself ineffective for not

adequately investigating and presenting during the state unified appeal the claim

that trial counsel was ineffective.  The district court rejected that contention on the

3

ground that the state trial court's rejection of it was not unreasonable under 28 U.S.C. § 2254(d). In making that decision, the district court considered looking to the Georgia Supreme Court's unexplained denial of a certificate of probable cause to appeal, but it decided instead to look to the trial court's explained rejection of the claim. App'x at 12 n.8. We have since held that the denial of a certificate of probable cause to appeal by the Georgia Supreme Court is a decision on the merits entitled to deference under § 2254(d), and it is to that decision instead of the typically more specific trial court decision that a federal habeas court should look. Wilson v. Warden, Ga. Diagnostic Prison, 834 F.3d 1227, 1232–33 (11th Cir. 2016) (en banc), cert. granted, No. 16-6855, __ U.S. __ (Feb. 27, 2017). Because it does not matter to the result, and to avoid any further complications if the United States Supreme Court disagrees with our Wilson decision, we have decided this appeal on the same basis that the district court did: by using the more state-trial-court focused approach in applying § 2254(d).

The state trial court, the district court, and the parties themselves agree that appellate counsel's performance in presenting the ineffective assistance of trial counsel claim was itself deficient. We accept that proposition for present purposes and turn to the prejudice requirement. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984) ("Unless a defendant makes both showings [deficient performance and prejudice], it cannot be said that the conviction or death

4

sentence resulted from a breakdown in the adversary process that renders the result unreliable."); Brooks v. Comm'r, Ala. Dep't of Corr., 719 F.3d 1292, 1300 (11th Cir. 2013) ("Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under Strickland.") (quotation marks omitted).

In the state habeas proceeding, the trial court found that Butts had not established prejudice from his appellate counsel's failures in investigating and presenting the trial counsel ineffectiveness claim during the unified appeal. We accord that decision the deference it is due under § 2254(d). See Harrington v. Richter, 562 U.S. 86, 100, 131 S. Ct. 770, 785 (2011) ("Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the United States Supreme] Court, § 2254(d)(1), or that it 'involved an unreasonable application of' such law, § 2254(d)(1), or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2).") (one citation omitted).

Determining whether appellate counsel's failure to adequately investigate and present the claim of trial counsel's ineffectiveness prejudiced Butts — whether there is a reasonable probability of a different result in the appeal had the claim been presented in an effective manner — requires determining whether trial

5

counsel was ineffective in the first place.  If trial counsel was not ineffective, then any of appellate counsel's failures in attempting to build a case that he was ineffective could not have prejudiced Butts.  See Hittson v. GDCP Warden, 759 F.3d 1210, 1262 (11th Cir. 2014) (recognizing that a petitioner could not be prejudiced by his counsel's failure to raise a meritless claim); Brown v. United States, 720 F.3d 1316, 1335 (11th Cir. 2013) ("It is also crystal clear that there can be no showing of actual prejudice from an appellate attorney's failure to raise a meritless claim.").  So the question is whether the trial counsel ineffectiveness claim was meritorious.

The more specific question, because of the deference we owe state courts under the Antiterrorism and Effective Death Penalty Act, is whether any fairminded jurist could agree with the state trial court's decision denying Butts habeas relief.  See 28 U.S.C. § 2254(d); Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2012).  "[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."  Holsey, 694 F.3d at 1257 (quotation marks omitted).  The district court issued an exceptionally thorough and persuasive order explaining why Butts did not meet that standard.  We adopt and incorporate as our own the relevant part

6

of that order, which is attached as an appendix to this opinion.[2]  We add, or emphasize, just a few points beyond what Judge Treadwell said in his order.

First, Butts contends that his trial team, and particularly its lead counsel, Robert Westin, was inexperienced.  To the contrary, we rarely see a trial attorney who is more experienced in capital defense, or has a better record in capital trials, than Westin.  As the district court pointed out, Westin had represented five capital defendants before Butts (and an additional three after him), and none of his other clients received a death sentence.  Westin was assisted by a co-counsel who had handled at least 25 to 50 felony cases before the Butts case.  And the paralegal who rounded out the defense team had worked on several death penalty cases before this one.  It was an experienced capital defense team, and that matters.  See Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc) ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."); Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1244 (11th Cir. 2010) (same); Williams v. Head, 185 F.3d 1223, 1229 (11th Cir. 1999) ("It matters to our analysis that

---

[2] We do not, however, adopt footnote 8 of the district court's opinion, which anticipated that we would rule differently than we did in the Wilson case.  Our later en banc decision in Wilson remains the law of the circuit unless and until the Supreme Court overrules it.  But whether that happens does not matter in this case because reviewing the state trial court's decision denying relief leads to the same conclusion as reviewing the Georgia Supreme Court's decision to deny a certificate of probable cause to appeal.  To simplify matters, and prevent them from being contingent on the Supreme Court's decision in Wilson, we have made the § 2254(d) determination based on the state trial court's explanation for its rejection of Butts' claim.

Richard Allen is an experienced criminal defense attorney."); Provenzano v.

Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) ("Our strong reluctance to second

guess strategic decisions is even greater where those decisions were made by

experienced criminal defense counsel.").

Second, Butts contends that his defense team did not investigate any

potential mitigation evidence.  Appellant's Br. at 38 ("Neither counsel conducted

any mitigation interviews or substantive investigation . . . and counsel did nothing

to investigate clear red flags in available records.").  To the contrary, we do not

often see cases in which a defense team investigated mitigating circumstance

evidence more thoroughly than this team did.  As the district court recounted:

> Trial counsel reviewed Butts's school records, medical records, employment records, juvenile and adult criminal records, records from the Baldwin County Department of Family and Children Services ("DFACS"), records from the Georgia Department of Human Resources ("DHR"), records from the Oconee Psychoeducational Center, and jail records.  Trial counsel also reviewed records of [Butts' father]'s mental illness and [Butts' mother]'s alcoholism and cocaine addiction.

(Footnote and citations omitted).  In addition, Butts' trial team interviewed three of

his four siblings, an uncle, his maternal great-aunt and maternal grandmother, a

friend, other members of a gang Butts was associated with, and all of Butts'

previous employers, supervisors, and co-workers that they could find.  They also

attempted to interview Butts' mother, who was uncooperative.

8

Third, Butts contends that trial counsel's performance was automatically deficient because they did not follow in lock step the recommendations of the American Bar Association and the Southern Center for Human Rights. At the time of the trial, the ABA recommended conducting "a thorough investigation of the defendant's life history and background" with "the assistance of investigators and other assistants." ABA Guideline 8.1, cmt. (1989). And the Southern Center for Human Rights recommended considering "[t]he use of social workers and other experts to present the case in mitigation." Southern Center for Human Rights Manual, ch. 1, p. 20.

Counsel must perform reasonably under "prevailing professional norms." Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. Those norms, Butts insists, are established by the recommendations of the ABA and the Southern Center for Human Rights. They aren't. Butts argues that the Supreme Court's decision in Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003), establishes that trial counsel performed deficiently by failing to follow those recommendations. It doesn't.

In Wiggins, trial counsel's investigation into Wiggins' life history consisted of reading a one-page description of his personal history from a presentence investigation report and gathering records about his placements in foster care. Id. at 523, 123 S. Ct. at 2536. Although those scant records referred to Wiggins' self-

9

described "disgusting" history, trial counsel did no further investigation. Id. at 523–26, 123 S. Ct. at 2536–38. If counsel had investigated, they would have discovered that Wiggins had suffered "severe physical and sexual abuse . . . at the hands of his mother and while in the care of a series of foster parents." Id. at 516–17, 123 S. Ct. at 2533. And despite asserting up until the day before Wiggins' sentencing phase began that they intended to introduce mitigation evidence, trial counsel did not end up presenting any of the probative evidence that they did have. Id. at 526, 123 S. Ct. at 2537–38. Instead, they put on a "halfhearted mitigation case" about the general effect of life sentences on prisoners and challenged Wiggins' direct responsibility for the murder. Id. at 526, 123 S. Ct. at 2538.

Faced with those facts the Supreme Court held that "[c]ounsel's decision not to expand their investigation . . . fell short of the professional standards that prevailed in Maryland" at the time of Wiggins' trial. Id. at 524, 123 S. Ct. at 2536. The Court reached that conclusion in part because trial counsel chose not to obtain a social history report, even though "standard practice in Maryland in capital cases at the time of Wiggins' trial included the preparation of a social history report." Id. at 524, 123 S. Ct. at 2536–37. It also noted that "[c]ounsel's conduct similarly fell short of the standards for capital defense work articulated by the [ABA] — standards to which we long have referred as 'guides to determining what is reasonable.'" Id. (citations omitted). The specific standard to which the Court

10

referred was a guideline providing that "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence." Id. at 524, 123 S. Ct. at 2537 (quotation marks omitted).  As a result of all the circumstances, the Supreme Court concluded that counsel's failure to conduct an adequate investigation constituted deficient performance.  Id. at 534, 123 S. Ct. at 2541–42.

The Wiggins decision did not hold that the guidelines and recommendations of the ABA or other organizations about how counsel should represent capital defendants establish prevailing professional norms.  The Supreme Court in Wiggins did not purport to overrule what it had said in Strickland:

> Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides.  No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.  Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause.

Strickland, 466 U.S. 688–89, 104 S. Ct. at 2065 (citation omitted); see also Buck v. Davis, No. 15-8049, 580 U.S. __, 2017 WL 685534, at *13 (Feb. 22, 2017) ("Strickland's first prong sets a high bar.  A defense lawyer navigating a criminal proceeding faces any number of choices about how best to make a client's case.

11

The lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'  It is only when the lawyer's errors were 'so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment' that <u>Strickland</u>'s first prong is satisfied.") (citations and some quotation marks omitted) (alteration in original).  The Supreme Court has explained that  "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." <u>Bobby v. Van Hook</u>, 558 U.S. 4, 7, 130 S. Ct. 13, 16 (2009).

The <u>Wiggins</u> case is different from this one.  In that case counsel conducted almost no personal history investigation even though there was a local professional norm of commissioning a social history report and clear signs pointing to the need for a social history report.  <u>Wiggins</u>, 539 U.S. at 524–25, 123 S. Ct. at 2536–37.  In this case, by contrast, instead of ignoring signs indicating that Butts' personal history might be useful in mitigation, the defense team undertook an exhaustive investigation into his childhood and upbringing.  They personally conducted that investigation and they did so, the record shows, at a time when mitigation experts were not routinely used in capital cases in the judicial circuit where this case was tried.  Counsel for Butts performed reasonably under the prevailing professional

12

norms of the time and place where the trial took place. See Bobby, 558 U.S. at 7, 130 S. Ct. at 16.

Fourth, Butts faults trial counsel for their decision to pursue a residual doubt strategy at the sentencing stage. But we have held a number of times that residual doubt can be an effective strategy at the sentencing stage of a capital case. See Chandler, 218 F.3d at 1319–20; Terrell v. GDCP Warden, 744 F.3d 1255, 1269 (11th Cir. 2014); Johnson v. Upton, 615 F.3d 1318, 1338 (11th Cir. 2010); Ward v. Hall, 592 F.3d 1144, 1170 (11th Cir. 2010); Hammond v. Hall, 586 F.3d 1289, 1333–34 & n.18 (11th Cir. 2009); Hannon v. Sec'y, Dep't of Corr., 562 F.3d 1146, 1154–55 (11th Cir. 2009); Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787–88 (11th Cir. 2003). We cannot and will not second guess trial counsel's strategic decision to focus on residual doubt instead of mitigation evidence, especially where that decision was made after a thorough investigation into mitigating circumstances. As the Supreme Court stated in Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690, 104 S. Ct. at 2066.

Finally, Butts contends that trial counsel left unrebutted evidence that the State presented at sentencing about Butts' membership in a gang, and that the failure to rebut that evidence was due to counsel's failure to investigate and present mitigating evidence about his upbringing. The factual premise of that contention is

13

false; as we have already explained, counsel did investigate Butts' life story, including his upbringing.

In addition, Butts did not preserve this particular claim by properly presenting it in the district court. He made only a passing reference to it (in his memorandum in support of his habeas petition), which is why it escaped the district court's attention. Passing references are not enough to present and preserve an issue. See Landers v. Warden, 776 F.3d 1288, 1296 (11th Cir. 2015) ("[T]he petitioner has waived this claim . . . . he failed to present this claim before the district court."); Gennusa v. Canova, 748 F.3d 1103, 1116 (11th Cir. 2014) (holding that a "single, passing reference" to an argument "unaccompanied by any discussion or elaboration" is insufficient to preserve an issue); Dupree v. Warden, 715 F.3d 1295, 1299 (11th Cir. 2013) ("A habeas petitioner must present a claim in clear and simple language such that the district court may not misunderstand it."). But even if Butts had presented and preserved this part of his claim in the district court, we would hold that it lacks merit.

We agree with the district court that Butts has not established that the Georgia trial court unreasonably rejected his claim that trial counsel failed to investigate, develop, and present mitigating evidence at sentencing, or that Butts

14

was prejudiced by appellate counsel's failure to investigate and adequately present

that claim during the unified appeal procedure.[3]

**AFFIRMED.**

---

[3] True to the finest traditions of the Bar, Butts' current attorneys have represented him pro bono throughout this federal habeas proceeding.  They have devoted a great deal of time to the task and have done good work.

# APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ROBERT EARL BUTTS, JR.,       :
                                   :
            Petitioner,      :
                                   :
            vs.           :
                                   :     CIVIL ACTION NO. 5:13-CV-194 (MTT)
WARDEN, Georgia Diagnostic and   :
Classification Prison,      :
                                   :
           Respondent.    :

## ORDER

**ROBERT EARL BUTTS, JR.** was sentenced to death for the murder of Donovan Corey Parks.   He petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   Although he alleges numerous errors on the part of the state courts that considered his claims, he raises four principal contentions:   (1) trial counsel were ineffective for failing to investigate and present mitigating evidence during the penalty phase of his trial, and appellate counsel handled this issue ineffectively on appeal; (2) trial counsel were ineffective when they failed to rebut or object to evidence of gang activity; (3) the trial court failed to give a "mere presence" instruction to the jury; and (4) the prosecutor's argument that Butts was the triggerman was inconsistent with his argument in Butts's co-defendant's trial, who was also sentenced to death.   After considering these claims, and other alleged constitutional errors,[1] the Court determines that it must deny habeas relief.

---

[1] The Court instructed Butts to brief all outstanding issues that he wished to pursue and this Order addresses only those claims that he argued in his briefs.   Any claim not briefed is deemed abandoned. *Blankenship v. Terry*, 2007 WL 4404972 at *41 (S. D. Ga. Dec. 13, 2007) (explaining that claims not briefed are abandoned because "mere recitation in a petition, unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments—hence, *litigate*—on a petitioner's behalf").

## I.    BACKGROUND AND PROCEDURAL HISTORY

## A.  Facts

The Georgia Supreme Court summarized the facts of this case in Butts's direct

appeal:

[O]n the night of March 28, 1996, Butts and Marion Wilson, Jr., drove in Butts's automobile to a local Wal–Mart store and began searching for a victim.   Butts entered the store wearing a coat, under which he likely concealed the murder weapon.   A witness observed Butts and Wilson standing behind Donovan Corey Parks in a checkout line.   The cashier for that checkout line also remembered Butts being in her line.   The store's receipts showed that Butts purchased a pack of chewing gum immediately after Parks made his purchase of pet supplies.

A witness overheard Butts asking Parks for a ride.   After Parks moved items in his automobile to make room for Butts and Wilson, Butts sat in the front passenger seat and Wilson sat in the back seat behind Parks. According to a witness to whom Butts confessed, Butts revealed the shotgun a short distance away, and Parks was ordered to stop the automobile.   Wilson dragged Parks out of the automobile by his tie and ordered him to lie facedown on the pavement.   Butts then fired one fatal shot to the back of Parks's head with the shotgun.   Witnesses nearby heard the shot, believing it to be a backfiring vehicle.

After murdering Parks, Butts and Wilson drove to a service station in Gray, Georgia, where they refueled Parks's automobile and where Wilson was filmed by the service station's security camera.   Butts and Wilson then drove to Atlanta in an unsuccessful attempt to exchange Parks's automobile for money at a "chop shop."   The pair purchased two cans of gasoline, drove to a remote location in Macon, Georgia, and set fire to Parks's automobile.   They then walked to a nearby public phone, where Butts called his uncle and arranged a ride for himself and Wilson back to the Wal–Mart to retrieve Butts's automobile.

Investigators had recorded the license plate numbers of the vehicles parked in the Wal–Mart parking lot on the night of the murder, and Butts's automobile was among them.   A shotgun loaded with an uncommon type of ammunition was found under Wilson's bed during a search, and a witness testified that Butts had given the weapon to Wilson to hold temporarily.   Two of Butts's former jail mates testified that he had admitted to being the triggerman in the murder.

*Butts v. State*, 273 Ga. 760, 761-62, 546 S.E.2d 472, 477-78 (2001).

## B. Procedural history

On November 20, 1998, a jury found Butts guilty of malice murder, armed robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-off shotgun. *Id.* at 761 n.1, 546 S.E.2d at 477 n.1. On November 21, 1998, the jury found beyond a reasonable doubt that the murder was committed during the commission of the capital felony of armed robbery and he was sentenced to death. *Id.*

Butts filed a motion for new trial, and a hearing was held on August 13, 1999. (Doc. 10-11).[2] On August 18, 1999, the Court denied the motion. (Doc. 8-5 at 81). Butts filed a notice of appeal on August 20, 1999. (Doc. 8-1 at 6). Also on August 20, 1999, the Court relieved trial counsel, Robert Westin and Cassandra Montford-Ford, of their representation and appointed Guy Notte[3] and Christopher Huskins to represent Butts on direct appeal. (Doc. 8-5 at 83).

Because Butts raised claims of ineffective assistance of trial counsel, the Georgia Supreme Court, on February 25, 2000, remanded the case to the trial court for an evidentiary hearing on these claims. (Docs. 10-13 at 37-49; 10-15). The trial court held that hearing on August 22, 2000 and on October 4, 2000 denied Butts's motion for new trial. (Docs. 10-16; 10-17 at 14).

Butts filed a notice of appeal, and on April 30, 2001, the Georgia Supreme Court affirmed his conviction and sentence. (Doc. 10-17 at 2); *Butts*, 273 Ga. at 761, 546

---

[2] Because all documents have been electronically filed, this Order cites to the record by using the document number and electronic screen page number shown at the top of each page by the Court's CM/ECF software.

[3] Notte was subsequently replaced by J. David McRee on October 13, 1999, and McRee was replaced by Green Berry Moore, III on October 21, 1999. (Doc. 10-17 at 4-7).

S.E.2d at 477.   The United States Supreme Court denied his petition for certiorari on January 7, 2002 and denied his motion for rehearing on March 4, 2002.   *Butts v. Georgia*, 534 U.S. 1086 (2002); *Butts v. Georgia*, 535 U.S. 922 (2002).

Butts filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on August 30, 2002.   (Doc. 11-4).   After conducting an evidentiary hearing, the state habeas court denied relief in an order filed April 11, 2011.   (Docs. 13-1 to 16-5; 16-23).   Butts filed a notice of appeal and an application for certificate of probable cause to appeal ("CPC application") with the Georgia Supreme Court.   (Docs. 16-24; 16-25).   In an order dated January 22, 2013, the court summarily denied his CPC application.   (Doc. 16-28).

On May 31, 2013, Butts filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court.   (Doc. 1).   The Respondent filed his answer, and the Court denied Butts's motion for discovery and an evidentiary hearing.   (Docs. 6, 22).   Both parties have now briefed exhaustion, procedural default, and the merits of Butts's various claims.   (Docs. 24, 27, 29, 32, 33).

## II.    STANDARD OF REVIEW

### A. Exhaustion and procedural default

Procedural default bars federal habeas review when a habeas petitioner has failed to exhaust state remedies that are no longer available or when the state court rejects the habeas petitioner's claim on independent state procedural grounds.   *Michigan v. Long,* 463 U.S. 1032, 1040-42 (1983) (explaining that an adequate and independent finding of procedural default will generally bar review of the federal claim); *Frazier v. Bouchard,* 661 F.3d 519, 524 n.7 (11th Cir. 2011); *Ward v. Hall,* 592 F.3d 1144, 1156-57 (11th Cir. 2010).

There are two exceptions to procedural default.   If the habeas respondent establishes that a default has occurred, the petitioner bears the burden of establishing "cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice."   *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) (citing *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977); *Marek v. Singletary*, 62 F.3d 1295, 1301-02 (11th Cir. 1995)).   A petitioner establishes cause by demonstrating that some objective factor external to the defense impeded his efforts to raise the claim properly in the state courts.   *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010) (quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)).   A petitioner establishes prejudice by showing that there is a reasonable probability that the result of the proceeding would have been different.   *Id*.   Regarding what is necessary to establish the narrowly-drawn fundamental miscarriage of justice exception, the Eleventh Circuit has stated:

> To excuse a default of a guilt-phase claim under [the fundamental miscarriage of justice] standard, a petitioner must prove "a constitutional violation [that] has probably resulted in the conviction of one who is actually innocent."   To gain review of a sentencing-phase claim based on [a fundamental miscarriage of justice], a petitioner must show that "but for constitutional error at his sentencing hearing, no reasonable juror could have found him eligible for the death penalty under [state] law."

*Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996) (citations omitted).

## B. Claims that were adjudicated on the merits in the state courts

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the standard of review.   This Court may not grant habeas relief with respect to any claim that has been adjudicated on the merits in state court unless the state court's decision was (1) contrary to clearly established Federal law; (2) involved an unreasonable application of

clearly established Federal law; or (3) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.    28 U.S.C. § 2254(d)(1)-(2); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011).    The phrase "clearly established Federal law" refers to the holdings of the United States Supreme Court that were in existence at the time of the relevant state court decision.    *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions."    *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (citing *Williams*, 529 U.S. at 404-05).

> Under § 2254(d)(1), "[a] state court's decision is 'contrary to'... clearly established law if it 'applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme] Court and nevertheless arrives at a [different] result….'"

*Michael v. Crosby,* 430 F.3d 1310, 1319 (11th Cir. 2005) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).

A state court's decision involves an "unreasonable application" of federal law when "'the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.'"    *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)).    An "unreasonable application" and an "incorrect application" are not the same:

> We have explained that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.    Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied

-6-

clearly established federal law erroneously or incorrectly.  Rather, that application must be objectively unreasonable.  This distinction creates a substantially higher threshold for obtaining relief than *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and quotation marks omitted).

Pursuant to 28 U.S.C. § 2254(d)(2), district courts can "grant habeas relief to a petitioner challenging a state court's factual findings only in those cases where the state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Price v. Allen*, 679 F.3d 1315, 1320 (11th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2)).  A state court's factual finding is not unreasonable simply because the federal habeas court might have made a different finding had it been the first court to interpret the record.  *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (citing *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  Also, a state court's factual determination is "presumed to be correct," and this presumption can only be rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## III.    PETITIONER'S CLAIMS

### A. Claim One:   Butts was deprived of his right to the effective assistance of counsel at all stages of his pretrial, trial, motion for new trial, and direct appeal proceedings.

Butts makes several ineffective assistance claims:   (1) trial and appellate counsel failed to investigate, develop, and present mitigating evidence; (2) trial and appellate counsel were ineffective in their handling of evidence of gang activity; and (3) trial counsel failed to argue in the sentencing phase that a sentence of death was disproportionate and, therefore, precluded by *Enmund v. Florida*, 458 U.S. 782 (1982).[4]

---

[4]  In addition, Butts argues that trial counsel failed to object to irrelevant and prejudicial victim impact

-7-

### 1. The clearly established federal law

*Strickland*[5] is "the touchstone for all ineffective assistance of counsel claims." *Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient.… Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687; *Wong v. Belmontes,* 558 U.S. 15, 16 (2009). To establish deficient performance, Butts must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The Court must apply a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). "To overcome that presumption, [Butts] must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, Butts must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When determining if prejudice exists, "it is necessary to consider *all* the relevant evidence that the jury would have had

---

evidence and trial counsel failed to request a jury instruction on mere presence. The Court addresses these two claims as part of Butts's claim that the trial court made improper rulings and other errors that deprived him of a fair trial. Butts also argues that trial counsel failed to object to the prosecution's presentation of inconsistent arguments. This claim is reviewed with Butts's claim that misconduct by the prosecutor deprived him of a fair trial.

[5] *Strickland v. Washington*, 466 U.S. 668 (1984). Although the *Strickland* test was announced in the context of an ineffective assistance of trial counsel claim, the same test applies to claims of ineffective assistance of appellate counsel. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).

before it if [Butts's counsel] had pursued the different path–not just the mitigation evidence [Butts's counsel] could have presented, but also the [aggravating evidence] that almost certainly would have come in with it." *Wong,* 558 U.S. at 20 (citing *Strickland*, 466 U.S. at 695-96, 700); *see also Porter v. McCollum*, 558 U.S. 30, 40-41 (2009).

Federal courts must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)). Butts must do more than satisfy the *Strickland* standard. "He must also show that in rejecting his ineffective assistance of counsel claim the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)). That is, "[t]he question is not whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S. at 105.

## 2. Claims that trial and appellate counsel failed to investigate, develop, and present mitigating evidence

Butts argues that trial counsel's most glaring deficiency was their failure to investigate his family life and background so they could develop and present mitigating evidence during the sentencing phase of his trial. (Doc. No. 24 at 47). He also alleges that appellate counsel's failure to raise adequately trial counsel's defective performance and resulting prejudice constituted ineffective assistance during his motion for new trial and direct appeal.

Multiple state courts have addressed these ineffective assistance claims. Thus, "it is useful at the outset to explain which state-court decisions we look to for purposes of

AEDPA review." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1231 (11th Cir. 2014).

Looking first at trial counsel, Butts argued on direct appeal that trial counsel were ineffective for not presenting mitigating testimony and pleas for mercy from family members. (Docs. 10-22 at 9-10, 41; 24 at 47). The Georgia Supreme Court rejected this claim on the merits and the state habeas court found the claim was *res judicata*. *Butts*, 273 Ga. at 769-70, 546 S.E.2d at 483; (Doc. 16-23 at 5). The state habeas court's conclusion that this claim was *res judicata* does not bar federal habeas review.[6] *Cone v. Bell*, 556 U.S. 449, 465-67 (2009); *Owens v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 915 n.23 (11th Cir. 2009).

The state habeas court found the following trial counsel ineffective assistance claims were procedurally defaulted because they were not raised on direct appeal, and Butts failed to establish cause and prejudice or a miscarriage of justice to excuse the default: trial counsel's failure to secure a neuropsychologist and have neuropsychological and neurological testing performed; trial counsel's failure "to conduct an adequate pretrial investigation into [Butts's] family life and background to uncover and present to the jury evidence in mitigation of punishment"; and trial counsel's failure "to present a picture of [Butts's] background and fail[ure] to call any witness who could present the jury with testimony of [Butts] as a unique human being." (Doc. 16-23 at 8, 14).

---

[6] The Court reviews this claim as part of Butts's broader claims that trial and appellate counsel were ineffective when they failed to investigate, develop, and present mitigating evidence. When the Georgia Supreme Court denied this particular ineffective assistance of trial counsel claim, it had only the limited evidence presented at the motion for new trial evidentiary hearing to review. This Court, however, considers the expanded record before the state habeas court. *Ferrell v. Hall*, 640 F.3d 1199, 1224-25 (11th Cir. 2011) (allowing for review of the "radically expanded record of mitigating evidence" when addressing a trial counsel ineffective assistance claim through an ineffective assistance of appellate counsel claim).

This Court cannot review claims the state habeas court found to be procedurally defaulted unless Butts establishes cause for, and actual prejudice from, the default or establishes that failure to review the claim would result in a fundamental miscarriage of justice.  *Lucas v. Warden*, 771 F.3d 785, 801 (11th Cir. 2014).   Butts argues that inadequate assistance of counsel on direct appeal establishes cause to overcome the default.   (Doc. 24 at 49).

An ineffective assistance of appellate counsel claim may, "if both exhausted and not procedurally defaulted, … constitute cause" to excuse procedural default.   *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Hill v. Jones*, 81 F.3d 1015, 1031 (11th Cir. 1996)).   Butts's ineffective assistance of appellate counsel claims[7] meet this criteria. The state habeas court addressed these claims on the merits and, thereafter, Butts raised his ineffective assistance of appellate counsel claims in his CPC application, which the Georgia Supreme Court summarily denied.   (Docs. 16-23 at 17; 16-25 at 2, 30-43; 16-28).   This denial is the final state court determination of Butts's ineffective assistance of appellate counsel claims and, under recent Eleventh Circuit precedent, the only question for this Court is whether there was any reasonable basis for the Georgia Supreme Court to deny relief.   *Hittson*, 759 F.3d at 1232-33 (explaining that post-*Richter*, *Ylst v. Nunnemaker*, 501 U.S. 797 (1991), no longer applies and federal courts reviewing under § 2254(d) are not required to "look through" the Georgia Supreme Court's summary denials of CPC applications to the reasons given in the "'last reasoned decision' by the state court.") (quoting *Ylst*, 501 U.S. at 804); *Lucas*, 771 F.3d at 792 (reasoning of the

---

[7]  State habeas counsel argued that appellate counsel were ineffective for failing to raise various errors made by trial counsel; failing to investigate and present mitigating evidence at the motion for new trial hearing; and failing to obtain a mitigation and/or gang expert to testify at the motion for new trial hearing. (Doc. 16-23 at 16).

state habeas court is irrelevant and petitioner must show there was no reasonable basis for the Georgia Supreme Court to deny relief).[8]

The state habeas court found that appellate counsel performed deficiently:

The Court finds that appellate counsel's failure to conduct an independent mitigation investigation constitutes deficient performance especially in light of the fact that appellate counsel alleged that trial counsel was ineffective in failing to present mitigating evidence.   In raising such a claim, a reasonably competent attorney would have looked beyond trial counsel's investigation to determine whether trial counsel's performance was reasonable.

(Doc. 16-23 at 17).   Respondent does not contest this finding, and this Court agrees that appellate counsel's complete failure to conduct any mitigation investigation amounted to

---

[8] This procedure, which calls for the federal courts to ignore the reasons given by the state habeas court for denying relief and hypothesize reasons why the Georgia Supreme Court could have denied the CPC application, has been called into question.   In *Hittson v. Chatman*, 135 S. Ct. 2126 (2015) (Ginsburg and Kagan, JJ., concurring in denial of certiorari), Justice Ginsburg stated, "[t]he Eleventh Circuit plainly erred in discarding *Ylst*."   *Id.* at 2127.   She explained that the instruction given in *Ylst,* that federal courts reviewing an unexplained state court order upholding a prior reasoned judgment "should presume that [the] 'later unexplained order[] upholding that judgment or rejecting the same claim rest[s] upon the same ground,'" was not disturbed by *Richter*.   *Id.* (quoting *Ylst*, 501 U.S. at 803).   Thus, federal courts are to look at the last reasoned decision from the state court (the decision from the state habeas court in this case) and determine whether it "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented."   28 U.S.C. § 2254(d).   The courts are not to "hypothesize reasons that might have supported the [Georgia Supreme Court's] unexplained order."   *Hittson*, 135 S. Ct. at 2127.   Three days after the Supreme Court denied certiorari in *Hittson,* it decided *Brumfield v. Cain*, 135 S. Ct. 2269 (2015).   In *Brumfield*, the Court observed that when "conducting the § 2254(d)(2) inquiry, we, like the courts below, 'look through' the Louisiana Supreme Court's summary denial of Brumfield's petition for review and evaluate the state trial court's reasoned decision …."   *Id.* at 2276 (citing *Johnson v. Williams*, 133 S. Ct. 1088, 1094, n.1 (2013) and *Ylst*, 501 U.S. at 806).   The Court confirmed what Justice Ginsburg said in *Hittson*:   *Richter* applies only "where there is no 'opinion explaining the reasons relief has been denied.'"   *Brumfield*, 135 S. Ct. at 2283 (quoting *Richter*, 562 U.S. at 98).   On July 30, 2015, the Eleventh Circuit granted en banc review in *Wilson v. Warden, Ga. Diagnostic Prison*, No. 14-10681.   The question for review is whether a federal habeas court is required to look through a state appellate court's summary decision that is an adjudication on the merits to the reasoning in a lower court decision when deciding whether the state appellate court's decision is entitled to deference under 28 U.S.C. § 2254(d).   In short, there is a good chance that the Eleventh Circuit will abandon *Hittson* and return to *Ylst*.   Accordingly, the Court has reviewed the factual findings and legal conclusions given by the state habeas court when that court's order provides the last reasoned analysis of a claim.   The Court has determined that the state habeas court's factual findings were reasonable and the legal conclusions were not contrary to, or unreasonable applications of, Supreme Court precedent.   28 U.S.C. § 2254(d).   Having found the state habeas court's bases for denying relief were reasonable, the Court necessarily finds that there were "arguments or theories [that] … could have supported" the Georgia Supreme Court's denial of relief. *Richter*, 562 U.S. at 102.

deficient performance.[9]

However, the state habeas court concluded no prejudice resulted from appellate counsel's deficient performance.   (Doc. 16-23 at 17-18).   The court found "that the best evidence of what appellate counsel would have discovered in an independent mitigation investigation [was] the evidence presented in the instant proceeding by present counsel." (Doc. 16-23 at 17-18).   The court determined that, had that evidence been presented, there was "no reasonable probability that the result of the Motion for New Trial or the direct appeal would have been different."   (Doc. 16-23 at 18).   The question is whether this ruling is contrary to *Strickland*, or unreasonable either legally or factually.

To answer this question, this Court, like the state courts, must analyze trial counsel's actions.   This effectively means that the procedural default of most of Butts's ineffective assistance of trial counsel claims has little practical effect on this Court's analysis.   It is necessary to review these ineffective assistance of trial counsel claims because they are central to (1) Butts's claim that appellate counsel were ineffective when they failed to raise trial counsel's ineffectiveness and (2) his argument that he has

---

[9] Christopher Huskins was appointed on August 20, 1999 and Green Berry Moore, III was appointed on October 21, 1999.   (Doc. 8-5 at 83; 10-17 at 4-7).   Moore was lead appellate counsel, responsible for all issues except those involving voir dire and the jury, for which Huskins was responsible.   (Doc. 13-2 at 38). Moore and Huskins raised several ineffective assistance claims, including that trial counsel were ineffective for failing to offer mitigating evidence and pleas for mercy from family members.   *Butts*, 273 Ga. at 762-63, 765-70, 546 S.E.2d at 478-84; (Doc. 10-13 at 9-11).   Because appellate counsel alleged ineffective assistance of trial counsel, the Georgia Supreme Court, on February 25, 2000, remanded that the case to the trial court so it could conduct an evidentiary hearing.   (Doc. 10-15).   To prepare for the hearing, Moore reviewed trial counsel's files, read the trial transcript, spoke with Westin, and spoke with Butts once or twice. (Doc. 13-2 at 40, 50).   Huskins could not recall speaking with Butts or Westin or conducting any type of investigation beyond reading the trial transcript.   (Doc. 13-2 at 73).   Neither appellate counsel conducted any additional investigation to determine whether there was mitigating evidence that trial counsel should have presented.   (Doc 13-2 at 41).   Instead, Moore just selected issues from the trial transcript that he thought trial counsel should have handled differently.   (Doc. 13-2 at 53-54, 58-61).   The motion for new trial hearing took place on August 22, 2000 and no witnesses other than Westin were called to testify. (Doc. 10-16).   Thus, during the year leading up to the evidentiary hearing, appellate counsel did little more than briefly speak with Butts and Westin, review Westin's file, and review the trial transcript.   (Doc. 13-2 at 40-56).   Without conducting any type of mitigation investigation, there was no way for appellate counsel to specify what evidence trial counsel should have presented.

established cause and prejudice necessary to entitle him to judicial review of these procedurally defaulted claims.

When a petitioner alleges that appellate counsel were ineffective for failing to raise ineffectiveness of trial counsel claims, the Eleventh Circuit has recognized that, "the state court could not effectively review appellate counsel's performance in challenging trial counsel's effectiveness in mitigation without re-examining trial counsel's performance as well." *Ferrell v. Hall*, 640 F.3d 1199, 1224-25 (11th Cir. 2011); *DeYoung v. Schofield*, 609 F.3d 1260, 1283 n.22 (11th Cir. 2010) (reasoning that "[r]ather than wade through [the] complexities" of whether ineffective assistance of appellate counsel excused procedural default of trial counsel ineffectiveness claims, the court would "discuss the merits of [petitioner's] trial counsel claims, as that alone resolves the case").

> In other words, whether appellate counsel failed to properly challenge trial counsel's mitigation inquiry focuses on essentially the same corpus of evidence and the same legal questions underlying trial counsel's effectiveness—which strategies did trial counsel pursue, were those strategies reasonable under the circumstances, and what kinds of penalty phase evidence was developed, or could reasonably have been developed.

*Ferrell*, 640 F.3d at 1225. The state habeas court recognized this and explained that, although Butts's "ineffective assistance of trial counsel claims are procedurally barred or procedurally defaulted, the [c]ourt considers the conduct of trial counsel as part of its analysis of [Butts's] ineffective assistance of appellate counsel." (Doc. 16-23 at 5 n.2, 14).

Thus, in the context of considering whether the state habeas court reasonably concluded no prejudice resulted from appellate counsel's deficient performance when litigating the ineffectiveness of trial counsel, this Court must review trial counsel's performance.

-14-

The record reveals the following:

a. Trial counsel's experience

Cassandra Montford-Ford was the first attorney[10] appointed to represent Butts. (Doc. 13-15 at 41).   She had been practicing law since 1991 and had been a sole practitioner in the Ocmulgee Judicial Circuit since 1993, handling family law matters and bankruptcies, as well as appointed misdemeanor and felony criminal cases.   (Doc. 13-15 at 30-34).   Between 1993 and the time of Butts's trial, she was appointed to handle one to two criminal cases per week and no more than two of the criminal cases went to trial each year.   (Doc. 13-15 at 35, 38).   While she had handled numerous felony cases, she had never handled a murder case.   (Doc. 13-15 at 123-24).   Montford-Ford met with Butts approximately three times and attended his commitment hearing prior to the trial court's July 25, 1996 appointment of Robert Westin as lead counsel.   (Docs. 8-1 at 24; 13-15 at 41-42).

Westin graduated law school in 1979 and had been practicing criminal law in the Ocmulgee Judicial Circuit for approximately 17 years at the time of Butts's trial.   (Doc. 10-16 at 29).   He was known as the "*de facto* public defender" in Wilkinson County, handling more than 90 percent of the criminal cases in that county.   (Doc. 10-16 at 30, 32).   Westin was lead or co-counsel in approximately 15 to 20 jury trials per year and, over his legal career, had been involved in approximately 350 to 400 jury trials total, 175 to 200 of which were criminal jury trials.   (Doc. 10-16 at 32).   Prior to his appointment to represent Butts, Westin had handled 16 to 18 murder cases.   (Doc. 10-16 at 31).   He had been second-chair in five capital cases, and none of those five defendants were

---

[10]  The date of Montford-Ford's appointment is unclear.   (Doc. 13-15 at 41).   Her appointment would have occurred between April 4, 1996, the date arrest warrants were issued, and July 25, 1996, the day Robert Westin was appointed.   (Doc. 8-1 at 8-17, 24)

sentenced to death.   (Docs. 10-16 at 35-39; 13-1 at 102).[11]

Butts alleges that the state habeas court's determination that Butts "was represented by a death-qualified, experienced death penalty litigator" was unreasonable because Westin and Montford-Ford had never been lead counsel in a death penalty case. (Doc. 16-23 at 19).   As noted, Westin had substantial experience trying criminal cases. (Doc. 10-16 at 29-33).   He "literally tried at least half and probably more of" his third capital case.   (Doc. 10-16 at 42).   Westin was assisted by Montford-Ford, who had been handling criminal cases since 1993, and a paralegal, Cindy Crawford, who had helped prepare several death penalty cases in the past.   (Docs. 10-16 at 41-42; 13-15 at 33-34). There is no clearly established Supreme Court precedent holding that if trial counsel in a death penalty case does not have a certain amount of experience he is *per se* ineffective. *Strickland*, 466 U.S. at 681 (explaining that experience is just one factor to consider when determining whether counsel's strategic choices were reasonable).   The Court knows of no requirement that counsel have previous experience as lead counsel in a capital case. Clearly, the state habeas court's determination that Butts was represented by experienced trial counsel was reasonable.

### b.  Trial counsel's mitigation investigation

In Westin's previous death penalty cases, he "was always the mitigation man" and "was involved in mostly the sentencing phase of the case."   (Doc. 13-1 at 102-03).   His role shifted in Butts's case, and he did not focus solely on mitigation but took "overall control of the case," making "organizational decisions, how to approach the case, [and deciding] … the trial strategy."   (Doc. 13-1 at 103-04).

---

[11] After Butts's trial, but prior to the state habeas evidentiary hearing, Westin handled three more death penalty cases, and in none of the three did his client receive a death sentence.   (Doc. 13-1 at 97-98).

Trial counsel hired Crawford to assist in preparation for trial.[12] (Doc. 13-26 at 22-23). Crawford had assisted Westin on at least three of his previous death penalty cases. (Docs. 10-16 at 42; 13-27 at 18). Prior to Butts's trial, Crawford had worked on approximately 600 criminal cases, including at least four capital cases. (Doc. 13-27 at 17-19).

Westin testified that although he hoped Butts would not be convicted of murder, they still focused "[a] great deal of" effort on the sentencing phase. (Doc. 13-1 at 55). Westin, Montford-Ford, and Crawford met every weekend to work on Butts's case. (Docs. 13-2 at 3). Westin testified that he reviewed the American Bar Association handbook on death penalty cases and the Southern Center for Human Rights Manual. (Doc. 13-1 at 53-54). He also contacted Michael Mears and Palmer Singleton, who were with the Southern Center for Human Rights, to discuss the case and to get assistance preparing for trial. (Docs. 13-1 at 128; 13-22 at 67). Westin reviewed the district attorney's file and interviewed witnesses listed in the file. (Doc. 13-1 at 105-06).

Westin, Montford-Ford, and Crawford met with Butts on numerous occasions. (Docs. 10-16 at 39-41; 13-15 at 49). Crawford had Butts complete a form regarding his personal history and background. (Docs. 13-1 at 68; 15-19 at 2-16). Westin explained that he never suspected Butts suffered from any mental illness or any mental deficiency. (Doc. 13-1 at 111). Thus, he thought using the form was appropriate, and he believed

---

[12] It is unclear exactly when Crawford was hired. At the time she was deposed on March 30, 2007, she did not have any of her files regarding Butts's case because they were all destroyed when her office burned in March 2004. (Doc. 13-26 at 2, 16). The record shows that trial counsel's motion for funds for paralegal and investigative services was filed June 23, 1997. (Doc. 8-1 at 101-02). On June 26, 1997, the trial court held an *ex parte* hearing and granted $8,000.00 for trial counsel to use as they "deem[ed] fit." (Doc. 8-7 at 3). The trial court's order granting "funds for support staff, paralegal services, investigative services, and psychological testing" was not filed until September 30, 1998. (Doc. 13-28 at 53). However, billing records show that trial counsel had a conference with Crawford on September 4, 1996 regarding her "becoming [the] paralegal on [Butts's] case" and she actually first interviewed Butts on September 6, 1996. (Docs. 13-26 at 22-23; 13-28 at 30).

Butts could provide correct information in response to the questions.    (Doc. 13-1 at 110).

On the questionnaire, Butts reported he received normal medical attention while growing

up; the family always had food; he spent a lot of time at his grandmother's house; his "real

father [was] never around"; and he had never been physically or sexually abused.

(Docs. 13-1 at 111; 15-19 at 2-16).

Crawford spoke with Butts's family members, including his half-brothers and his

younger half-sister, Tameica Butts.[13]    (Doc. 13-26 at 122-23).    Crawford spoke with

Butts's uncle, Earnest Waller, briefly on one occasion.    However, Waller was intoxicated

at the time, and when she returned to ask additional questions, she was told that he did

not wish to speak with her.    (Doc. 13-26 at 133-34).    Montford-Ford testified that she

stayed in touch with family members but, by the time of her February 12, 2007 deposition,

she could not recall anything specific about his family or the conversations she had with

them.    (Doc. 13-15 at 57).    Westin spoke with Butts's younger half-brother, Dominique

Hurt, and Butts's uncle, Ernest Waller.    (Doc. 13-1 at 121-22).     According to Westin,

Butts's mother, Laura Butts, refused to participate in the case.    (Doc. 10-16 at 46).    He

called her a "nonplayer," explaining she would not visit his office, refused to talk to

members of the defense team, would not attend hearings, and did not attend Butts's trial.

(Doc. 13-1 at 63).    Laura's testimony at the state habeas evidentiary hearing supported

Westin's recollection.    Following Butts's arrest, she met with Montford-Ford once after a

pretrial hearing and met with Westin once or twice for five or ten minutes.    (Doc. 13-6 at

123, 132).    Laura testified she managed to "sober[] up" in time to attend only one day of

---

[13]  As noted, Crawford's files were destroyed in 2004.    (Doc. 13-26 at 16).    When she gave her deposition on March 30, 2007, almost nine years after Butts's trial, she had difficulty remembering exactly what tasks she performed in Butts's case.    Thus, the extent of Crawford's mitigation investigation is unclear.    (Doc. 13-26 at 34, 44, 49-50, 54, 57, 106, 114).

-18-

her son's trial—the day he was sentenced.   (Doc. 13-6 at 124, 133-34).   Trial counsel was unable to locate Butts's father, Robert Butts, Sr.   (Doc. 10-16 at 45-46).   Westin testified that Butts's maternal great-aunt, Doris Cooper, and maternal grandmother, Mary Frances Waller, stayed in constant contact with trial counsel, provided background information, and attended every day of Butts's trial.   (Docs. 10-16 at 46; 13-15 at 58-59).

On the questionnaire that Butts completed, he listed his former girlfriend, Angela Simmons, and Westin spoke with her. (Docs. 13-1 at 115; 15-19 at 6).   Butts listed Antonio Redding as a friend, and Crawford spoke with him, as well as other members of the FOLKS gang, on several occasions.   (Docs. 13-26 at 52-55, 61; 15-19 at 5).

Westin testified he spoke with all of Butts's previous employers and co-workers. (Docs. 10-16 at 57; 13-22 at 3-4).   He explained that Butts had six or seven jobs in the past, all of which he had lost due to his inability to get along with people.   (Doc. 10-16 at 56-58).   For example, Butts lost one job because he got into a fight with a customer. (Doc. 10-16 at 57).

Trial counsel reviewed Butts's school records,[14] medical records, employment records, juvenile and adult criminal records, records from the Baldwin County Department of Family and Children Services ("DFACS"), records from the Georgia Department of Human Resources ("DHR"), records from the Oconee Psychoeducational Center, and jail records.   (Docs. 13-1 at 70; 13-2 at 8-12; 13-15 at 129-30; 13-16 at 3; 14-15 at 38 to 14-23 at 90).   Trial counsel also reviewed records of Butts, Sr.'s mental illness and Laura's alcoholism and cocaine addiction.[15]   (Docs. 13-2 at 12-13, 27; 14-24 at 1-30).

---

[14]  According to Westin, Butts's school records revealed that he was an average student until he lost interest in his education at age 15 or 16.   (Doc. 13-2 at 9).   At that time he was placed "in the alternative school a couple of times and finally just quit after failing the tenth grade twice."   (Doc. 13-2 at 9).
[15]  During the August 22, 2000 motion for new trial hearing, Westin testified that family members reported

On September 4, 1998, the State moved for Butts to undergo a mental evaluation and he was examined by Dr. Jerold Lower on September 22, 1998.   (Docs. 8-3 at 115-17; 10-9 at 66).   On November 10, 1998, Lower reported to trial counsel, the district attorney, and the trial court that

> [f]ormal intellectual testing yielded a score which falls at the bottom of the mild range of mental retardation, in the lowest one thousandth of the general population.   The psychomotor testing also yielded one score at the bottom of the borderline range and one score at the bottom of the critical range, indicating possible organic impairment of the central nervous system.   However, in my opinion this testing is invalid.   School records revealed that Mr. Butts, in his first year of high school, earned passing grades in all except one of his courses (which appeared to constitute a standard high school curriculum).   This is markedly inconsistent with the test results or with a diagnosis of retardation….
>
> My strong impression is that Mr. Butts was definitely not attempting to give his best performance on the intellectual test and that his score in no way reflects his true ability.   Moreover, on the psychomotor tests I had the distinct impression that his errors were primarily the result of carelessness and lack of involvement in the task.

(Doc. 10-9 at 68-69).   Lower opined that Butts "suffers from a long-standing personality disorder characterized by … poor judgment and impulse control, disregard for social mores, [and an] inability to form close relationships or become involved in others … complicated by a great deal of substance abuse."   (Doc. 10-9 at 69).   According to Lower, this personality disorder would be "quite resistant to modification."   (Doc. 10-9 at 70).   Lower found Butts was competent to stand trial, was not suffering from any mental

Butts, Sr. had psychological "issues," and that led him to get records from Central State Hospital.   (Doc. 10-16 at 45-46).   He explained that Butts, Sr. had been in and out of Central State Hospital as a long-term patient and had "some significant issues."   (Doc. 10-16 at 45-46).   Seven years later, at the September 2007 state habeas evidentiary hearing, Westin at first testified that he was not aware of Butts Sr.'s psychological problems, and he did not obtain any records of such.   (Doc. 13-1 at 71).   However, when his testimony from the motion for new trial was read to him, Westin recalled getting Butts Sr.'s mental health records.   (Doc. 13-2 at 13).   The transcript from a June 26, 1997 pretrial hearing confirms that Westin knew Butts's "family has a history of treatment at Central State Hospital," and Westin's notes showed Butts Sr. was "in 1/2 way house @ Central State."   (Docs. 8-8 at 42; 15-6 at 57).   Thus, it appears Westin investigated Butts, Sr.'s mental health.   However, the Court cannot locate Butts, Sr.'s Central State Hospital records in the record.

disorder that would have prevented him from knowing right from wrong at the time of the crime, had no major disorder of mood or thought, and was not mentally ill or mentally retarded.   (Doc. 10-9 at 69-70).

Trial counsel had Butts examined by psychologist James E. Stark.   (Doc. 15-12 at 3-4).   Stark reported to trial counsel that:   Butts had low-average intelligence; was antisocial and impulsive; was frequently in trouble with society or the law; lacked self-control; was hostile toward, and very suspicious of, others; did not have "any organic brain dysfunction"; might occasionally have had psychotic episodes; and was "quite impulsive."   (Doc. 15-12 at 3-4).   Stark's diagnosis was "mood disorder with occasional psychotic episodes" with "[u]nderlying … antisocial and possibly schizotypal personality disorder."   (Doc. 15-12 at 4).

Butts contends this pre-trial investigation was inadequate.   (Doc. 24 at 51).   When preparing a capital case, trial counsel "'has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.'"   *Grayson v. Thompson*, 257 F.3d 1194, 1225 (11th Cir. 2001) (quoting *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir. 1994)).   "Counsel has 'no absolute duty to investigate particular facts or a certain line of defense,' although in some circumstances, 'a complete failure to investigate may constitute deficient performance of counsel.'"   *DeYoung*, 609 F.3d at 1283 (quoting *Parker v. Sec'y for the Dep't of Corr.*, 331 F.3d 764, 787 (11th Cir. 2003)).   Nor is counsel "required to pursue every path until it bears fruit or until all hope withers."   *Chandler v. U.S.*, 218 F.3d 1305, 1318 (11th Cir. 2000) (citation and quotation marks omitted).   In this case, the state habeas court found "that trial counsel's investigation into [Butts's] background was reasonable and thorough."

(Doc. 16-23 at 32).

Butts argues this finding is unreasonable for several reasons. He alleges that the state habeas court ignored the fact that trial counsel's sole focus was the guilt phase of the trial and they, therefore, conducted only a cursory mitigation investigation. (Doc. 24 at 53). According to Butts, had the state habeas court "scrutinize[d]" Westin's testimony, along with that of Montford-Ford and Crawford, it would have realized that trial counsel interviewed only Butts's mother, grandmother, and aunt. (Doc. 24 at 64). The record verifies that trial counsel did consider guilt or innocence to be the "heart" of Butts's case. (Doc. 10-16 at 45). Additionally, as the state habeas court acknowledged, it was "unclear … which member of the defense team was primarily responsible for the pretrial mitigation investigation." (Doc. 16-23 at 23). However, the record shows trial counsel and Crawford spoke with various persons in addition to Butts's mother, grandmother, and aunt, including Butts's half-brothers,[16] half-sister Tameica,[17] uncle,[18] former co-workers and employers, ex-girlfriend, Redding, and other FOLKS gang members. (Docs. 10-16 at 57-58; 13-1 at 115-16, 122; 13-2 at 17-18; 13-22 at 2-4; 13-26 at 121-23, 133-34; 13-27 at 1, 27).

---

[16] Citing testimony from Westin's February 2007 deposition and September 2007 state habeas evidentiary hearing, Butts alleges Westin "was under the false impression that Mr. Butts had only one sibling, a younger brother…." (Doc. 24 at 53). What Westin actually said at the state habeas evidentiary hearing was that he was sure they knew Butts had several half-brothers and half-sisters, he just could not remember them at the time, which was almost nine years after Butts's trial. (Doc. 13-1 at 65). Trial counsel were aware of Butts's siblings because Butts listed them on the questionnaire trial counsel had him complete and numerous records obtained by trial counsel showed their names. (Docs.14-23 at 43, 57, 79, 86; 15-19 at 3).

[17] Crawford recalled Tameica "didn't really have anything to say to [her]. She just wanted [Crawford] to answer all of her questions." (Doc. 13-26 at 123).

[18] Crawford recalled speaking briefly with an intoxicated uncle, Ernest Waller. (Doc. 13-26 at 133-34). When she returned on a later occasion to interview him, she was told to leave. (Doc. 13-26 at 134). Westin testified that he spoke with Ernest Waller, and he "didn't want to testify" at Butts's trial. (Doc. 13-1 at 122).

Butts argues that trial counsel should have interviewed more family members,[19] his former school teachers, or Laura's various boyfriends. But "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009). Given what trial counsel learned from Butts, family members, co-workers, employers, ex-girlfriend, Redding, two psychologists, and various records, their "'decision not to seek more' mitigating evidence from [Butts's] background 'than was already in hand' fell within the range of professionally reasonable judgments.'" *Id.* at 11-12 (quoting *Strickland*, 466 U.S. at 699).

Butts argues the state habeas court unreasonably ignored the unrebutted testimony from numerous family members and acquaintances who stated that they were never contacted by trial counsel, but had they been, they would have been willing to testify for Butts. (Doc. 24 at 54). This Court cannot assume the state habeas court ignored testimony from Butts's family members simply because it did not discuss or cite such testimony in its order. A state court is not required to "accompany its decision with any explanation, let alone an adequate one." *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1329 (11th Cir. 2013) (citations omitted). Fully explained or not, this Court must give the state court's opinion the "benefit of the doubt." *Lee v. Comm'r Ala. Dep't of Corr.*, 726 F.3d 1172, 1212 (11th Cir. 2013) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The state habeas court obviously believed Westin, Montford-Ford, and Crawford's testimony that they contacted several family members, but they were unable to find any of

---

[19] Butts faults trial counsel for failing to interview his biological father. Apparently they were not able to find him. As discussed, trial counsel knew Butts, Sr.'s was Butts's biological father and that he had mental issues. (Doc. 10-16 at 45-46). Westin testified that they were "never able to locate him." (Doc. 10-16 at 45-56). It is not clear what Butts, Sr. could have added. He did not testify or provide an affidavit during the state habeas proceeding.

-23-

them willing to testify for Butts.[20]    (Docs. 10-16 at 46-47; 13-1 at 120-21; 13-15 at 106-07;

13-27 at 32-33).    According to Westin:

> [T]here's nothing you would like better in a case like this to have a mom or
> grandmom or an aunt or somebody get up here and cry and say, he's a
> good boy.   Made the wrong decision….   And, you know, they wouldn't do
> it.   I mean they would not do it.   I begged them to do it and they would not.

(Doc. 10-16 at 46-47).

> Moreover, Westin worried that family members' testimony might not be helpful:

> [T]heir opinion of him, even these two, the aunt and the grandmother said
> he was a cold-blooded killer.   His brother looked up to him because he was
> in a gang, and his mother wouldn't even come to the hearing, she didn't
> care.   She never came to the pretrial hearing.   She didn't come to the trial.

> I mean, I was told by the people who probably knew him better than
> anybody, probably his real people who raised him, he was going down the
> wrong road early on and they weren't surprised at all that he was involved in
> this.

(Docs. 13-22 at 3).    Westin stated that Butts's aunt and grandmother, "who were

probably the closest people to [Butts]" told him "they couldn't get up and say a good thing

about [Butts], they'd have to tell the truth."    (Doc. 13-1 at 120).

Butts acknowledges that trial counsel "collect[ed] a number of records … prior to

trial."    (Doc. 24 at 69).    He claims, however, that they failed to "identify red-flags, gather

additional investigative leads, and … assess the value of the records as evidentiary

---

[20]  Butts argues that Laura's testimony at the state habeas evidentiary hearing directly contradicts Westin's testimony that she would not talk to trial counsel, attend hearings, or testify at trial.  (Doc. 24 at 55-56).   At the state habeas evidentiary hearing, Laura stated that she would have testified at trial if she had been asked and if she had been sober.   (Doc. 13-6 at 123-24).   Butts calls this testimony "particularly instructive" and argues that it shows "no one on the defense team ever conducted a substantive interview of her."  (Doc. 24 at 56-58).   He also argues that the fact she testified at the state habeas evidentiary hearing when asked proves she would have testified at Butts's trial if asked.   (Doc. 24 at 57).   It does not.   Butts's trial occurred nine years before the state habeas evidentiary hearing, and Laura admitted she was too intoxicated from alcohol and/or drugs to even show up for his trial until the very last day.   (Doc. 13-6 at 121-23; 130-31).   When her testimony is read as a whole, it supports Westin's recollection that they were unable to get Laura involved in Butts's case—she would not attend meetings, failed to show up for hearings, and would not even talk to them.   (Doc. 13-1 at 63).

exhibits during the penalty phase." (Doc. 24 at 69). Trial counsel obtained most, if not all, of the records that were submitted by state habeas counsel. (Docs. 13-1 at 70; 13-2 at 5, 8-14; 13-15 at 129-30; 13-16 at 3; 14-15 at 38 to 14-23 at 90). From these records, trial counsel learned of Laura's drug and alcohol abuse, Butts, Sr.'s mental health issues and his absence from the home, and Dominique's behavioral problems. (Docs. 10-16 at 45-46; 13-2 at 8-13; 14-23 at 36-90). They knew the records suggested that Butts had been neglected, but there was nothing in the records about physical or sexual abuse, and Butts denied any such abuse.[21] (Docs. 13-1 at 111-13; 13-2 at 14-15). School records verified that Butts was an average student until around age 15 or 16 when he had to be placed in an alternative school for behavioral problems. (Docs. 13-1 at 112; 14-15 at 47, 49, 77, 87; 14-16 at 6, 28, 32-33; 14-17 at 3, 5, 35-37).

Butts argues that if trial counsel had carefully reviewed the records, they would have learned that Laura left 13 to 15 year old Butts and his siblings alone for days at a time while she abused crack cocaine and alcohol. (Doc. 24 at 71). The record shows trial counsel were aware that Butts's mother "wasn't around very much" and Butts, Sr. was not involved in Butts's life. (Doc. 13-1 at 113, 122-23). Westin testified that he knew Laura was a neglectful mother, who "didn't care much about what was going on with her son." (Doc. 13-1 at 64). He explained,

> the two that I spent the most time with was his grandmother and his aunt
> and you've got to remember, I think this is his mother's mother, okay? …
> I'm almost certain. And so she didn't want to say an awful lot of bad stuff
> about his mother, but it was pretty clear that he didn't have a lot of guidance

---

[21] At the state habeas evidentiary hearing, the only testimony of any type of physical abuse was Laura's statement that one of her boyfriends, Isaac Jones, once threw Butts to the floor, put his knee in Butts's back, and pulled Butts's arms behind his back. (Doc. 13-6 at 118). Butts's half-sister testified that she could not recall any type of physical abuse, and Butts's mitigation expert testified that Butts was not physically abused. (Doc. 13-4 at 76-77, 109-10). Prior to trial, Butts reported that he had not been physically or sexually abused. (Doc. 15-19 at 3-4).

when he was growing up.   It was pretty clear.   Men in and out, didn't know his father, mother apparently had some problems, criminal, drug, alcohol.   I know she was just nonexistent during the trial….

(Doc. 13-1 at 122-23).

However, Westin testified that his "impression" and what he was actually told by Butts and his family members is that Butts's grandmother and aunt, who "were just wonderful people," "essentially raised … Butts."   (Doc. 13-2 at 14-15).   Butts reported that he "spent a lot of time at [his grandmother's] house [and] she helped raise him."   (Doc. 15-19 at 5).   The records they obtained verified this.   Butts's school records and probation file showed his grandmother as the contact person.   (Doc. 13-7 at 24-25).   Additionally, records obtained from DHR and DFACS showed his grandmother, uncle, and Harold Burton, one of Laura's long-term live-in boyfriends, took care of the Butts children.   (Doc. 13-7 at 17-18).

In its conclusion regarding trial counsel's sentencing phase investigation, the state habeas court found:

> The record is clear that trial counsel obtained [Butts's] background records and information regarding [Butts's] family members.   Trial counsel were aware of the substance abuse problems of [Butts's] mother, the mental health problems of [Butts's] father, the behavioral problems of [Butts's] brother Dominique, and [Butts's] dysfunctional family life, which trial counsel described as neglectful.   [Butts] has failed to establish that trial counsel were deficient in their investigation prior to trial.

(Doc. 16-23 at 32-33).   This Court is unable to say that "no 'fairminded jurist' could agree with" this determination.   *Holsey v. Warden*, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting *Richter*, 562 U.S. at 101).   Therefore, the state habeas court's finding that trial counsel's pretrial mitigation investigation was sufficient was reasonable and cannot be upset by this Court.

c. Trial counsel's failure to hire a mitigation expert

According to Butts, the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines") and the capital case training manual ("Manual") published by the Southern Center for Human Rights both stress the need to employ a "mental health clinician or forensic social worker, who could explain the significance of [a defendant's] social and family history."   (Doc. 24 at 95).   Trial counsel did not hire such an expert, and the state habeas court found their failure to do so did not amount to deficient performance.   (Doc. 16-23 at 35 n.9).   Butts argues this ruling constituted an unreasonable application of *Strickland* because the Guidelines and Manual show trial counsel's conduct "'fell below prevailing professional norms.'"   (Doc. 24 at 98) (quoting *Strickland*, 466 U.S. at 688).   Also, he claims the state habeas court's decision was based on the unreasonable factual determination that Westin could develop mitigating evidence without the assistance of a mitigation expert. (Doc. 24 at 98).[22]

The Guidelines and Manual are "are 'only guides' to what reasonableness means, not its definition."   *Van Hook*, 558 U.S. at 8 (quoting *Strickland*, 466 U.S. at 688).   Butts cites no Supreme Court precedent holding that trial counsel *must* retain a mitigation expert, and his reliance on *Wiggins v. Smith*, 539 U.S. 510 (2003), is misplaced.   In *Wiggins*, testimony revealed that it was "standard practice in Maryland in capital cases at the time of Wiggins's trial" to have a social history report prepared.   *Id*. at 524.   "Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report."   *Id*.   Thus, trial

---

[22]  The Court has already determined that Westin, along with Montford-Ford and Crawford, conducted a reasonable mitigation investigation.

counsel's actions fell below "the professional standard that prevailed in Maryland" at the time of Wiggin's trial. *Id.* The Court "did not find counsel's failure to utilize a social worker per se ineffective; rather, it was that such failure rendered counsel's performance deficient under the relevant professional standards." *Newland v. Hall*, 527 F.3d 1162, 1206 (11th Cir. 2008) (citing *Wiggins*, 539 U.S. at 524-25).

Butts proffered no evidence that professional standards in the Ocmulgee Judicial Circuit or Georgia in 1998 required using a mitigation expert. To the contrary, testimony revealed that mitigation experts were not routinely used in death penalty cases. Westin stated that he employed mitigation experts in two previous cases in which mental health issues warranted it. (Doc. 13-1 at 61-62, 67). However, he had "never been a big … fan of them unless [he] had a specific issue." (Doc. 13-1 at 68). He opined that "if you were to talk to a lot of people that have been death penalty qualified, have tried a lot of cases like I have, they would probably agree that they're not all they're cut out to be." (Doc. 13-1 at 68). District Attorney Fred Bright, who had been a prosecutor in the Ocmulgee Judicial Circuit for 13 years at the time of Butts's trial, testified that he did not believe it was "effective to have both witnesses and an expert who can explain what all those witnesses' testimony means." (Doc. 13-6 at 35). He explained that he rarely sees mitigation experts testify in death penalty cases. (Doc. 13-6 at 33). In fact, he had been involved in approximately 25 death penalty cases and he could recall only one mitigation expert testifying during sentencing. (Doc. 13-6 at 33-34). Of course, the Court is not suggesting that prosecutors can set performance standards for defense counsel. The point is that neither legal authority nor actual experience supports Butts's argument that a defense lawyer must hire a mitigation expert.

-28-

Therefore, the state habeas court's finding that trial counsel did not perform deficiently when they failed to hire a mitigation expert was not factually or legally unreasonable.

### d.  Trial counsel's trial strategy and presentation

Westin testified that trial counsel's mitigation investigation yielded little helpful information.   (Doc. 10-16 at 56-57).   The investigation revealed Butts had a "tough upbringing" as "do a lot of kids," but Westin did not think Butts's "upbringing was extremely different from anybody else's, many other young men."   (Doc. 13-1 at 123). Westin felt that jurors in the Ocmulgee Judicial Circuit were not as sympathetic to the fact that someone had a bad childhood as they may have been at one time.   (Doc. 13-2 at 12-13).   He explained, "there's just been too many high publicity cases where people claim that they were victims and so now somehow that mitigates what they may or may not have done."   (Doc. 13-2 at 13).

Specifically, Westin testified that no former employer would speak favorably about Butts.   (Doc. 13-1 at 119).   Also, no family member was willing to testify for Butts. (Doc. 10-16 at 47).   Westin stated he "[c]ouldn't have drug them up there with wild horses."   (Doc. 13-1 at 123).   Westin could not call jailers to speak favorably about Butts because he had been in a fight with another inmate, threatened to hit a guard, and started a fire in his cell.    (Docs. 10-6 at 33-35; 10-7 at 1-13).   Westin explained that "[o]utside of his aunt and grandma, there was nobody that could say a kind word about him," and even they refused to testify on his behalf.   (Docs. 10-16 at 58; 13-1 at 120).

Instead of using mitigation witnesses, trial counsel opted to use a residual doubt or lingering doubt theory at sentencing.   Their theory of the case was that Wilson, who was

the leader of the FOLKS gang and already serving a death sentence, led Butts down the wrong path, and it was Wilson who actually killed Parks.   (Docs. 13-1 at 57; 13-2 at 16).   "Our strategy from the very beginning in this case was to shift all of … the blame … to Mr. Wilson….   Our … trial strategy from early on was that Mr. Butts was an unknowing and unwilling participant in this really unfortunate event."   (Doc. 10-16 at 8).   The "thrust" was that Butts should be acquitted but, if not, residual doubt should prevent the imposition of the death penalty.   (Doc. 10-16 at 18-19).   Westin explained:

> We had a real shot at – if not an outright acquittal – a verdict of something less than first degree murder….   [W]e felt like even … if we lost in the guilt and innocence phase … and he gets convicted of murder…. residual doubt … was going to flow right through to the sentencing phase and … coupled with Mr. Wilson's prior record, and the fact that he was already on death row, that … was an effective argument to make to this jury that there was just one gunshot and there's already a man on death row for that killing.

(Doc. 10-16 at 18-19).   Westin summed up his strategy for sentencing:   "I was just trying to keep it as simple as I could….   [T]he lowest common denominator, basically, in this case …was who done it … and if he didn't do the shooting, then he shouldn't get the death penalty."   (Doc. 13-2 at 36).

In his opening statement and closing argument during the guilt phase, Westin argued that Butts was guilty of only stealing Parks's car.   (Docs. 9-7 at 61; 10-4 at 21). He was not guilty of murder because Butts did not know, or have reason to know, that Wilson would murder Parks.   (Doc. 9-7 at 52-57, 61).   He claimed Butts never saw Wilson with a gun on the night of the murder, and, other than asking Parks for a ride, there was nothing linking Butts to Parks's murder.   (Docs. 9-7 at 58-60; 10-4 at 34).   Westin claimed that Butts did not exit the car while Wilson and an unidentified third person in a truck murdered Parks.   (Doc. 9-7 at 51-53).   The jury was told that Wilson had been

-30-

found guilty of murdering Parks and sentenced to death.   (Doc. 9-7 at 51, 64).

Through witnesses called during the guilt phase, Westin tried to establish that Wilson owned the murder weapon, but he did not have it in the car on the night of the murder.   Instead, a third person, with whom Wilson had contact that night, had the gun and brought it to Felton Drive, where this other person and Wilson used it to murder Parks while Butts waited in the car.[23]   (Docs. 9-7 at 122, 129-30, 133; 9-8 at 69, 72-73, 82; 10-1 at 127, 130, 10-2 at 14-16, 91).

During the guilt phase, Butts testified[24] that on the night of the murder, he and Wilson were driving around looking for a car to steal because Wilson needed money. (Doc. 10-2 at 116-17).   He explained that Wilson lost all of his money gambling and had no way of making more because his drugs had been stolen.   (Doc. 10-2 at 116).   Wilson hoped to steal a car to sell to a chop-shop in Atlanta.   (Doc. 10-2 at 116-17).   When they were unable to locate a car to steal, Wilson instructed Butts that he should ask someone for a ride so they could steal the person's car.   (Doc. 10-2 at 120).   Butts agreed and they drove to the Wal-Mart where Wilson talked to "some guy" in the parking lot.   (Doc. 10-2 at 121).   Butts entered the Wal-Mart to purchase gum and when he returned, Wilson instructed him to ask Parks for a ride.   (Doc. 10-2 at 123).   Butts did so and when Parks agreed, Butts got in the front passenger seat, Wilson got into the back seat behind Parks, and the other man, to whom Wilson had been speaking, got into the backseat beside Wilson.   This other person exited the car before Parks, Wilson, and Butts left the

---

[23]  The State countered this version of events with evidence that Butts told two of his fellow inmates that he was the one who actually shot Parks.   (Doc. 9-14 at 43-45, 102).

[24]  Westin stated that Butts wanted to testify on his own behalf, and Westin agreed with his decision, thinking it would provide an opportunity to "humanize" Butts.   (Doc. 13-20 at 29).   Westin spent 12 to 15 hours preparing Butts to testify.   (Docs. 10-16 at 47; 13-20 at 29).

parking lot in Parks's car.   (Doc. 10-2 at 124).   As Wilson directed Parks to turn onto Felton Drive, a truck drove up behind Parks's vehicle and flashed its lights.   (Doc. 10-2 at 125).   Wilson told Parks to stop the car because he thought he knew the driver of the truck.   (Doc. 10-2 at 125).   When Parks stopped, Wilson exited the car, opened the driver's side door, "snatched [Parks] out [of] the car by his tie," and drug him to the back of the car.   (Doc. 10-2 at 125-26).   While Butts remained in Parks's car, he overheard someone say "give us all your money," and then heard a gunshot.   (Doc. 10-2 at 126).   Butts testified that he never got out of the car, and he never saw Wilson with a gun the night of the murder.   (Doc. 10-2 at 117, 127).   After hearing the gunshot, Butts claimed that he was "scared," "upset," "sick at the stomach," and afraid of Wilson.   (Doc. 10-2 at 128-29).[25]

During the sentencing phase, the State presented evidence of Butts's criminal history.   In March and April 1994, when he was 16, Butts committed three burglaries and one attempted burglary.   (Doc. 10-5 at 36-44, 59-65, 108-10).   Although Butts agreed to return the items he had stolen, he never did.   (Doc. 10-5 at 65).   He failed to report to his probation officer on a regular basis, showing up only two or three times between August 1994 and May 1996.   (Doc. 10-5 at 123).   In March 1996, his probation officer filed a petition to revoke Butts's probation because of his failure to report and pay restitution. (Doc. 10-5 at 126-28).   His probation was not revoked because Butts was employed at the time and the court wanted to give him an opportunity to pay restitution to the burglary victims.   (Doc. 10-5 at 127-28).   He never did.   He paid only $50.00 of the $1,223.23 restitution he owed.   (Doc. 10-5 at 121).

---

[25]  After Butts's testimony and closing arguments, it took the jury approximately one hour and five minutes to find him guilty on all counts.   (Doc. 10-5 at 11, 15).

-32-

In January 1995, 17 year old Butts pumped gas into his car and drove off without paying.   (Doc. 10-5 at 132).

In October 1995, Milledgeville police officers responded to a call that shots were being fired in the vicinity of the Milledgeville Manor Apartments ("the Manor").[26]   (Doc. 10-6 at 13).   When an officer stopped Butts and several other men in the area, Butts threw down a matchbox and started to walk away.   (Doc. 10-6 at 13-14).   At gunpoint, the officer ordered him to stop and retrieved the matchbox, which contained crack cocaine.   (Doc. 10-6 at 14).   Officers frisked Butts and found a loaded .380 caliber semi-automatic handgun.   (Doc. 10-6 at 16).   Butts was charged with violation of the Georgia Controlled Substances Act, possession of cocaine, and carrying a concealed weapon.   (Doc. 10-6 at 17).

In November 1995, Butts was fined $500.00 and placed on 12 months probation for shoplifting.   (Docs. 10-5 at 151-52; 10-6 at 7-9).

In January 1996, Butts pled nolo contendre to driving under the influence.   (Doc. 10-5 at 140-42).

Also at sentencing, the State presented evidence that police found cocaine and a holster in Butts's car when it was searched following his arrest for Parks's murder.   (Doc. 10-7 at 17-19, 38).   They also found FOLKS gang paraphernalia in Butts's home, room, and car.   (Docs. 10-5 at 67, 69, 73-74, 86; 10-7 at 29 32, 34-37).

The State also presented evidence that after Butts was jailed for Parks's murder, he had been in a fight with another inmate, threatened a guard, started a fire in his cell,

---

[26] The Milledgeville Manor Apartments are referred to in various places in the record as "the Manor." (Docs. 9-8 at 71; 9-11 at 143; 10-2 at 144-45).   It is a low income housing project that is "notorious" for gang-related and non-gang-related crime.   (Doc. 13-3 at 29-30).

and wrote OG[27] on his tennis shoes.   (Docs. 10-6 at 33-35; 10-7 at 1-13).

Through cross-examination of the State's sentencing phase witnesses, trial counsel established that none of the gang paraphernalia found in Butts's home had his name on it, and that it may have belonged to one of his siblings; Butts's name was not on the list of known gang members, and, until Park's murder, the authorities had no information that Butts was involved in gang activity; Wilson was the leader of the local FOLKS gang; and, while Butts was not a model inmate, he was not the worst prisoner jailers had encountered.   (Docs. 10-5 at 103-04; 10-6 at 1, 40; 10-7 at 42-43).

Trial counsel presented the testimony of an expert polygraphist, Georgia Bureau of Investigation ("GBI") special agent David Rush.   (Doc. 10-7 at 54).   Rush testified that he performed a voluntary polygraph examination of Wilson.   (Doc. 10-7 at 61-62).   Rush testified that "[i]t was [his] opinion, based on the polygraph exam that Mr. Wilson was the shooter."   (Doc. 10-7 at 67).

Trial counsel had Sheriff Howard Sills read a portion of his testimony from Wilson's trial.   (Doc. 10-7 at 78).   In this testimony, Sills stated that Butts had committed no violent felonies in the past.   (Doc. 10-7 at 80, 84).   His criminal records consisted mainly of misdemeanor convictions, and his only prior felonies were violation of the Georgia Controlled Substances Act, possession of a firearm during commission of a crime, and concealing a weapon; all of which stemmed from his October 1995 arrest.   (Doc. 10-7 at 80-81).

In his closing argument, Westin told the jury that they did not have to sentence Butts to death just because the State proved Parks was robbed and murdered.   Instead, they should consider the "principle ... called residual doubt."   (Doc. 10-7 at 109).   He

---

[27] OG stands for "original gangster" in gang terminology.   (Doc. 10-7 at 12-13).

argued Butts was young and mistakenly let Wilson lead him into this situation.   While

Butts was culpable, "his culpability may not rise to the level of execution."   (Doc. 10-7 at

112).   Westin told the jury that the following facts made it more likely that Wilson, not

Butts, was the shooter:   the murder weapon was found at Wilson's home; Wilson was a

violent person with an "extensive criminal history," while Butts's criminal career was brief

and consisted of mainly misdemeanors; Wilson was the leader of the FOLKS gang, but

Butts was not even known to be a gang member; and there was testimony that Butts was

in a daze following the murder.[28]   (Doc. 10-7 at 110-13).

The state habeas court found that trial counsel, after conducting the defense

investigation, made a strategic decision "to present a mitigation theory of residual doubt"

instead of evidence of Butts's family life or background.   (Doc. 16-23 at 32).   The court

found this strategy was reasonable.   (Doc. 16-23 at 31-33).   Next, the state habeas

court determined that trial counsel's actual presentation of evidence and argument to

support the residual doubt theory was reasonable.   (Doc. 16-23 at 34-35).   Butts argues

that these findings were factually and/or legally unreasonable.   (Doc. 24 at 83-95).

Westin testified that trial counsel made the "conscious decision" to use residual

doubt:

> Q.   You collected all of this information and evidence on [Butts's]
> background, and you previously stated that you made a conscious decision
> not to put it up.   What was your reason for that?
>
> A.   Most of it really wasn't positive. The only spin today that I can put on it
> that would be positive is that because his mother had some, a lot of issues
> and neglected him and unfortunately he didn't, either the aunt and the
> grandmother came in too late, but for whatever reason, he was, I could have
> used that spin, he was a victim because he was brought up in a neglected
> household, was able to run the streets, nobody could control him, he didn't
> have a father figure, he was a victim, society made him what he was.   But

---

[28] The jury returned a death sentence in approximately 48 minutes.   (Doc. 10-7 at 136).

that almost gives up the point that he wasn't the killer.   You see what I'm saying?   On the one hand you're trying to get this jury to say, to understand our position, that he didn't shoot Mr. Parks, but if you're saying that he was a victim, they made him do this, then you're sort of counterproductive, if that makes any sense.

But I will say this.   I laid awake … hours upon hours upon hours, and I talked it through with myself, I talked it through with my staff or the people that were working for me, [Crawford], [Montford-Ford], the aunt, the grandmother.   This wasn't a decision I made by myself but it was a conscious decision to do it just as it was done, no more and no less.   It probably could have been done better but –

Q.   And that conscious decision was to focus on residual doubt during mitigation?

A.   Residual doubt.   I felt like if we could carry the fact over from the – I mean, if he was convicted, which there was a high probability, there is no question about that, I mean, he's a party to the crime …, but it's better than being the shooter in this case.   And I felt like the jury might give him the benefit of the doubt since … Wilson had already had been convicted.   They already had their man.   He was already up here on death row, and there was only one shot fired.   So, that was how we, that's how I approached it.

(Doc. 13-2 at 22-23).

Despite this testimony, Butts argues that one phrase Westin said in his closing argument—"taking into account what I believe I could easily infer to you as a lack of any family structure"—shows Westin did not strategically choose to exclude such evidence. (Docs. 10-7 at 122; 24 at 35).   Westin ended his closing argument by saying

I stand here hat in hand.   Robert cannot stand here.   Unfortunately, he has to rely on – on me.   I may not have done a very good job talking for him and on his behalf.   But I'm the only one here who can talk for him.   And I'm going to just do some real talking right now.   I'm standing here hat in hand, asking you to think about all of the–the facts and circumstances of this case; all of the dynamics involved; what may have happened and what may not have happened; taking into account the youth of this young man; taking into account what I believe I could easily infer to you as a lack of any family structure; taking into account his—his getting with older men—other young men, but older than him who were influencing him down a very bad road; taking into account the lure of being—trying to be older than we really are. Very common.   Taking all that into consideration and weighing it

-36-

against—weighing it right along with the fact that whatever happens to Robert as a result of your sentence will not change the pain that anyone in this courtroom's feeling.   And I am asking you, hat in hand, to find a reason, if you would, just do that one favor for me, think about it, and give life a chance.   Thank you.

(Doc. 10-7 at 121-22).

Looking at the phrase, "taking into account what I believe I could easily infer to you as a lack of any family structure," in context, the Court cannot find it undermines Westin's assertion that he deliberately chose to use residual doubt instead of background evidence during sentencing.   Rather, Westin's closing argument as a whole, along with the evidence presented during both phases of trial, all support trial counsel's "strategy … to shift all of that attention—to actually shift the blame in this case to Mr. Wilson."   (Doc. 10-16 at 8).   Certainly, this phrase alone would not allow the Court to say that no "fairminded jurist" could agree with the state habeas court's factual finding that trial counsel strategically chose to use residual doubt instead of background evidence.   *See Richter*, 562 U.S. at 101 (holding factual finding unreasonable only if no "fairminded jurist" could agree with it); *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998) (explaining that "[t]he question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct").

Butts argues that "Westin's claim … that 'residual doubt' was a carefully thought out strategy … is … undermined" by Westin's concession during his closing that the State had proven the existence of the alleged statutory aggravating circumstance—that the murder was committed during the commission of an armed robbery.[29]   (Doc. 24 at 88).

---

[29] Butts also argues that, in addition to casting doubt on whether trial counsel were deliberately pursuing a strategy of residual doubt, Westin's concession that the statutory aggravating factor had been proven

-37-

After telling the jury that the State had proven the killing took place during an armed robbery, Westin told the jury that their "inquiry goes much deeper." (Doc. 10-7 at 109). He told them that they did not have to sentence Butts to death "simply because [they] … found a statutory aggravating circumstance." (Doc. 10-7 at 109). Instead, they should consider that Wilson was likely the triggerman because the gun was found at his home, he was the leader of the FOLKS gang, and he was a violent person with an extensive criminal record. (Doc. 10-7 at 110-11). Westin asked the jury not to impose the ultimate penalty of death if they thought Wilson was the shooter and if they believed Butts's culpability did "not rise to the level" of execution. (Doc. 10-7 at 112). Thus, conceding that the jury could find Parks was killed during the commission of an armed robbery did not undermine trial counsel's strategy to put as much blame as possible on Wilson and make the jury believe Wilson was the actual shooter.

When making the factual determination that Westin strategically chose to use residual doubt, the state habeas court quoted Westin's testimony from the motion for new trial hearing. (Docs. 10-16 at 19; 16-23 at 20). Westin testified that Wilson's criminal record was part of the reason he chose to use residual doubt, and he "brought in Mr.

amounted to ineffective assistance. (Doc. 24 at 88). On appeal, the Georgia Supreme Court denied this claim. *Butts*, 273 Ga. at 770, 546 S.E.2d at 484. The court held that "[b]ecause the jury had just found Butts guilty of armed robbery beyond a reasonable doubt in the guilt phase, it was reasonable for counsel to concede that point and to argue for a sentence less than death based on other factors." *Id.* Without citation to authority, Butts argues this finding was unreasonable because "[i]t is simply per se unreasonable, if trial counsel's strategy was allegedly residual doubt, to concede to the jury the presence of an aggravating factor." (Doc. 24 at 89). Trial counsel informed the jury that the court would instruct them that they did "not have to sentence Robert to death simply because [they] … found a statutory aggravating circumstance." (Doc. 10-7 at 109). Instead, they should consider "residual doubt" regarding whether Butts was the actual shooter. (Doc. 10-7 at 109-11). Westin implored them to consider that it was more likely that Wilson, not Butts, shot Parks and, therefore, Butts's "culpability [did] not rise to the level of that most final of all sentences." (Doc. 10-7 at 112). The Georgia Supreme Court's decision—that trial counsel were not ineffective when they argued for a sentence less than death based on these "other factors"—was not legally or factually unreasonable. *Butts*, 273 Ga. at 770, 546 S.E.2d at 484. Indeed, if anything is "per se unreasonable," it is Butts's argument that Westin should have argued to jurors, who had found Butts guilty of armed robbery based on essentially undisputed evidence that an armed robbery had occurred, that there was no robbery.

Wilson's prior record; … [and] read from the sentencing phase of Mr. Wilson's trial, that he had shot at least two people that I recall; shot a dog." (Docs. 10-16 at 19; 16-23 at 20). Butts correctly points out that trial counsel did not present Wilson's record to the jury. (Doc. 29 at 42). Butts argues Westin was trying to "bolster his allegedly tactical decision to pursue a strategy of residual doubt" by misstating the evidence that he presented at the sentencing phase and the state habeas court unreasonably "rubber stamp[ed]" his testimony. (Doc. 29 at 42). Notwithstanding the inaccuracy of Westin's recollection of what he presented during sentencing, the state habeas court's factual finding that Westin made the strategic decision to pursue residual doubt remains supported. Westin testified that he chose residual doubt because they were unable to locate family members who would testify for Butts, there was no physical evidence linking Butts to the murder weapon, Wilson was older than Butts and was a gang leader, and Wilson had already been found guilty of murdering Parks and was on death row. (Doc. 10-16 at 18-19). The Court finds that the state habeas court's ultimate conclusion that Westin made the strategic choice to use residual doubt rests on sufficient factual bases apart from any unreasonable finding regarding what Westin ultimately presented at the sentencing hearing.[30] *Pineda v. Warden, Calhoun State Prison*, 2015 WL 5521565, at *2 (11th Cir. 2015) (determining that the state court's ultimate conclusion was entitled to deference because it was based on adequate facts in spite of one incorrect and unreasonable factual finding); *Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011) (questioning whether the state court's ultimate determination rests on a sufficient factual basis apart

---

[30] Perhaps a better argument would be that trial counsel were ineffective for failing to present Wilson's record during sentencing. In a September 4, 1998 pretrial hearing, trial counsel discussed their desire to present Wilson's criminal record, including his juvenile record, during sentencing. (Doc. 8-10 at 92-95). It is unclear why Wilson's record was not presented. However, Butts did not raise this argument before the state courts, and he does not make it here.

from erroneous factual finding).

In addition to finding that trial counsel made a strategic choice to use residual doubt instead of background evidence, the state habeas court found their decision to do so was reasonable.   (Doc. 16-23 at 19-22).   As explained above, trial counsel conducted a thorough investigation into Butts's life history.[31]   They determined that "[t]his was not so much a case where we had a lot of mitigation":   although Butts was neglected by his mother and father, his grandmother and aunt "raised him"; there was no evidence that he was ever physically or sexually abused; the family had adequate food; he received adequate medical care; he was an average student until age 15 or 16, when he "went to alternative school twice … for class disruptions, fights"; employment records revealed he managed to find employment but lost most of his jobs due to fighting with co-workers, supervisors, or customers; and jail records showed he had to be transferred for fighting with other inmates and starting a fire in his jail cell.   (Docs 10-16 at 18, 56-57; 13-1 at 110, 119; 13-2 at 7-9; 14-15 at 38; 14-17 at 37).   While Westin thought that Butts's childhood had been difficult and knew that his mother was addicted to alcohol and drugs, he believed, based on his years of experience in the Ocmulgee Judicial Circuit, that "the bad childhood thing doesn't play as well as it did at one time…. Jurors aren't as sympathetic to … the fact that somebody's just had a, kind of a bad" childhood.   (Doc. 13-2 at 12).   Also, no family members were willing to testify for Butts or about Butts's background.   (Docs. 10-16 at 46-47, 58; 13-1 at 120-23).

---

[31]  Butts argues that even if trial counsel's strategy was to use residual doubt, their choice "was not based on a sound investigation and therefore was unreasonable and deserves no deference."   (Doc. 24 at 86).   The Court has already considered the record and determined that trial counsel's investigation into possible mitigating evidence was reasonable.   (See pages 16 to 26 of this Order).

With these factors in mind, and after discussing the issue on numerous occasions, trial counsel decided to use a residual doubt strategy.   (Doc. 10-16 at 43).   Such decisions, when "made after thorough investigation of law and facts relevant to plausible options[,] are virtually unchallengeable…."   *Strickland*, 466 U.S. at 690.   Also, Westin's "sense of the jury's reaction to testimony or evidence is a sound basis on which to make strategic decisions."   *Spaziano v. Singletary*, 36 F.3d 1028, 1040 (11th Cir. 1994).   To prove trial counsel's strategy was "outside the wide range of reasonable professional assistance," Butts must show "'that the approach taken by defense counsel would not have been used by professionally competent counsel.'"   *Id.* at 1041 (quoting *Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988)).   He has not made such a showing.   "At most, he has established that his present counsel would not have pursued the same strategy, a showing which misses the target by a wide mark."   *Id.*

Butts argues that to be reasonable, trial counsel's strategy had to include evidence concerning the impact of Butts's dysfunctional family and background.   However, there is "[n]o absolute duty … to introduce mitigating or character evidence" during the sentencing phase of trial.   *Chandler*, 218 F.3d at 1319.   In fact, the Eleventh Circuit has noted "that residual doubt is perhaps the most effective strategy to employ at sentencing." *Chandler*, 218 F.3d at 1320 n.28 (citing *Tarver v. Hopper*, 169 F.3d 710, 715-16 (11th Cir. 1999)).

> [F]ocusing on acquittal at trial and then on residual doubt at sentencing (instead of other forms of mitigation) can be reasonable.   Especially when—as in this case—the evidence of guilt was not overwhelming, we expect that petitioners can rarely (if ever) prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client.

*Id*. at 1320 (citing *Tarver*, 159 F.3d at 715-16).

One of the reasons trial counsel offered for not presenting background evidence is that do so

> almost gives up the point that [Butts] wasn't the killer….   On the one hand you're trying to get this jury to say, to understand our position, that he didn't shoot Mr. Parks, but if you're saying that he was a victim, they made him do this, then you're sort of counterproductive ….

(Doc. 13-2 at 22).   Quoting this testimony, the state habeas court ruled that the Georgia Supreme Court and the Eleventh Circuit have recognized such concerns can reasonably "preclude[ ] the presentation of potentially mitigating evidence of this type."   (Doc. 16-23 at 42-43) (citing *Turpin v. Christenson*, 269 Ga. 226, 244, 497 S.E.2d 216, 231 (1998), *Chandler*, 218 F.3d at 1319, and *Dill v. Allen*, 488 F.3d 1344, 1357 (11th Cir. 2007)). Butts argues this ruling was "unreasonable as a matter of law," and the reasonable strategy would have been for trial counsel to argue residual doubt **and** present evidence of Butts's difficult childhood to explain how he came to make a series of unfortunate choices on the night of Parks's murder.   (Doc. 24 at 89-90).   Butts may, or may not, be correct that combining these two strategies would have been beneficial.   However, trial counsel is not required to present every possible theory that might be helpful to his client. *Dill*, 488 F.3d at 1357.   "[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable."   *Chandler*, 218 F.3d at 1318.   Butts has not made such a showing.

After finding that trial counsel's decision to use residual doubt at sentencing was strategic and reasonable, the state habeas court found that trial counsel's presentation of evidence and argument to support this strategy was reasonable.   (Doc. 16-23 at 35). Starting in the guilt phase of the trial, trial counsel argued and presented evidence that

-42-

Butts was not the shooter.   (Docs. 9-7 at 52-57, 61, 122, 129-30, 133; 9-8 at 79, 72-73, 82; 10-1 at 127, 130; 10-2 at 14-16, 91, 126-29).   At sentencing, Rush testified that he administered a voluntary polygraph to Wilson, and, based on the results of that examination, he concluded Wilson was the shooter.   (Doc. 10-7 at 54, 62, 67-68). Sills's testimony from Wilson's trial, which was read into the record, established that Butts did not have a violent criminal history.   (Doc. 10-7 at 79-80).   In closing, trial counsel argued that a "youthful" Butts made a foolish mistake when he was led into this situation by Wilson.   (Doc. 10-7 at 111).   In an effort to convince the jury that Wilson was the triggerman, trial counsel argued Wilson had "a propensity to be a violent person," "a very extensive criminal history," and was known to be "right at the top of the list of the F[OLK] Gang membership."   (Doc. 10-7 at 110-11).   In contrast, Butts had a "brief," nonviolent criminal career, and, prior to Park's murder, was not on local law enforcement's list of gang members.   (Doc. 10-7 at 111-13).   Westin stressed that Butts's culpability, or the "unwarranted actions of [Butts] … under the tutorledge [sic] of Marion Wilson, who … is already on death row," did "not rise to the level of that most final of all sentences."   (Doc. 10-7 at 112, 118).   After careful examination of the record, the Court finds that the state habeas court's determination that trial counsel made a reasonable presentation to support their residual doubt strategy did not involve an objectively unreasonable application of *Strickland*, nor was it based on any unreasonable determination of the facts.

e. The prejudice allegedly suffered because trial counsel failed to investigate and present mitigating evidence

Butts presented 16 witnesses at the state habeas evidentiary hearing, eight of whom were family members, friends, teachers, and a guidance counselor who offered

-43-

personal background information about Butts and his family.   He also presented

testimony from a former DFACS case worker and an expert "clinical social worker with

expertise in conducting biopsychosocial assessments for the courts in capital cases."[32]

(Doc. 13-4 at 98).

Butts's mother, Laura, testified that her biological father and mother never married,

and she grew up with a verbally and physically abusive stepfather.   (Doc. 13-6 at

100-02).   Laura's brother, Johnny Waller, provided similar testimony.   (Doc. 13-6 at

70-72).   Laura explained that she was suspended from school at least seven times for

fighting and ultimately dropped out of school in the ninth grade.   (Doc. 13-6 at 103-04).

She became pregnant at age 16 and in 1975 gave birth to her first child, Tammy.   (Doc.

13-6 at 104-05, 109).   She never married or lived with Tammy's father.   (Doc. 13-6 at

108).

Although Laura had long been married to Robert Butts, Sr., they lived together for

only 11 months after Butts was born on May 14, 1977.   (Docs. 13-6 at 109-10; 13-13 at

80).   Laura testified that she left Butts, Sr. because of his increasingly bizarre behavior,

and neither she nor her children had any contact with him again.   (Doc. 13-6 at 109-10,

129; 13-13 at 80).   She said that Butts, Sr. had been in and out of mental institutions and

prisons since that time.   (Doc. 13-6 at 110-11).

When Laura left Butt's Sr., she, Tammy, and Butts moved into Riverbend

Apartments in Milledgeville, Georgia.   (Doc. 13-6 at 111-12).   They, along with Laura's

various male companions, lived in this apartment for the next 12 years.   (Doc. 13-6 at

---

[32] The other witnesses were Westin; Moore; Huskins; Detective Ricky Horn; John Hagedorn, a gang expert; and District Attorney Fred Bright.   (Doc 13-1 at 10-11).

111).    Jerome Wright, who is the father of Laura's third child, Tamayo,[33] lived with Laura

and her children for two and one-half years before leaving for unknown reasons.    (Doc.

13-6 at 112-13).    Next, Calvin Hurt, Dominique's[34] father, moved in for approximately two

to three years.    (Doc. 13-6 at 114).    Hurt drank heavily and was physically abusive to

Laura.    (Doc. 13-6 at 114).    Next, Harold Burton, Tameica's[35] father, lived with the Butts

family for approximately eight to ten years.[36]    (Doc. 13-6 at 115, 126-27).    When Burton

moved out, Laura became involved with Isaac Jones, a drug dealer, who physically

abused her.    (Doc. 13-6 at 117-18).    Laura recalled one occasion when Jones threw

Butts on the floor, put his knee in his back, and pulled his arms behind his back.    (Doc.

13-6 at 118).    After breaking up with Jones, Laura dated Harold Jimerson, a drug dealer

who was married to someone else during the 12 years he and Laura were together.

(Doc. 13-6 at 119).

Laura testified that she started abusing alcohol as a teenager and began using

crack cocaine in 1986.    (Doc. 13-6 at 105-06).    The only period of time during which she

did not drink to excess was a six-year span that started after Butts's trial ended.[37]    (Doc.

---

[33] Tamayo was born on May 16, 1980.    (Doc. 13-11 at 4).

[34] Dominique Hurt, Laura's fourth child, was born on December 1, 1982.    (Doc. 13-11 at 4).

[35] Tameica, Laura's fifth child, was born on July 5, 1986.    (Doc. 13-11 at 4).

[36] It is unclear exactly how long Burton lived with, or was involved with, the Butts family.    In his affidavit, Burton stated he became involved with Laura in approximately 1985 and lived with the family "on and off" for approximately nine years.    (Doc. 13-13 at 77).    Jan Vogelsang, Butts's mitigation expert, estimated that Burton was involved with the Butts family from 1986 until 1995.    (Doc 13-4 at 127).    Laura estimated that she and Burton lived together for eight years.    (Doc. 13-6 at 126-27).    Tracy Burton, Harold Burton's sister-in-law, testified that Burton and Laura were together for approximately ten years, until at least 1996. (Doc. 13-4 at 50).    On the undated questionnaire that Butts completed following Westin's appointment in July 1996, he indicated that his mother and Burton "broke up about 7 weeks ago."    (Docs. 13-1 at 111; 15-19 at 4).

[37] Laura's oldest daughter, Tammy, testified that her mother did not drink alcohol between 1997 and 2003. (Doc. 13-4 at 65).    Tameica testified that she remembered her mother was sober from 1998 until 2004. (Doc. 13-6 at 65).    Laura testified she was sure she did not stop drinking until after Butts's trial was over.

13-6 at 106).   She stopped using crack cocaine four months before the September 2007 state habeas evidentiary hearing.   (Doc. 13-6 at 106).   Laura stated she consumed alcohol during all five of her pregnancies,[38] and ended up on welfare after losing various jobs because of her alcoholism and drug addiction.   (Doc. 13-6 at 105, 113).

According to Laura, when she used crack cocaine, she would stay away from home for months at a time, spend all of her money on drugs, and pawn whatever she had to get money for drugs.   (Doc. 13-6 at 108).   Laura explained she left home to smoke crack cocaine because she was not comfortable taking drugs in front of her children.   (Doc. 13-6 at 108).   When she was absent from the home, the children sometimes were left alone, but her grandmother Mary Lee Waller, mother Mary Frances Cooper, aunt Doris Cooper, brother Johnny Waller, or boyfriend Burton frequently kept the children.   (Doc. 13-6 at 126-27).   Laura testified that she went through at least seven detoxification and rehabilitation programs.   (Doc. 13-6 at 107).

Laura admitted she was never involved in Butts's life.   She never spoke with his teachers, did not know what school activities or sports he was involved in, did not take him to church, did not know that he had to repeat the tenth or eleventh grades, did not know he had dropped out of school, and did not know that he was arrested for burglary and attempted burglary in 1994 or shoplifting in 1995.   (Doc. 13-6 at 121-22, 130-31).   She did know that Butts was arrested in 1995 for possession of cocaine, possession of a firearm during the commission of a crime, and carrying a concealed weapon.   (Doc. 13-6 at 130).   However, she did not go to juvenile court with Butts when he pled guilty to these

_____

(Doc. 13-6 at 106).   In fact, she was too impaired to attend any day of his trial except the last.   (Doc. 13-6 at 123-24).

[38] There was testimony that her alcohol consumption did not impact Butts's birth.   (Doc. 13-4 at 118).

-46-

charges, and she never spoke with his probation officer.   (Doc. 13-6 at 130).

Tammy, Butts's older half-sister, testified that she could not recall ever living with Butts, Sr., but she knew he was mentally ill and frequently in jail.   (Doc. 13-4 at 59). Tammy testified that Dominique's father, who lived with them for a period of time, was physically and verbally abusive to Laura and would "whip" or "spank" Butts and Tamayo to discipline them.   (Doc. 13-4 at 62).   Tammy could not recall ever being physically abused by any of her mother's various boyfriends.   (Doc. 13-4 at 76-77).   She testified that Burton lived with their family for "over ten years," and he was "a decent guy" who worked and took care of them when their mother was not home.   (Doc. 13-4 at 65-66).

Tammy testified that after working at various factory jobs, her mother went on welfare and received food stamps.   (Doc. 13-4 at 61-62).   She recalled that her mother always abused alcohol and, in 1985 or 1986, started abusing crack cocaine.   (Doc 13-4 66).   She said Laura and various other people drank alcohol and used drugs in their home.[39]   (Doc. 13-4 at 71-72).   When her mother drank alcohol to excess, she "fussed, cursed, was loud, [and] wanted her way."   (Doc. 13-4 at 64).   After Laura started using drugs, "[s]he would stay away from home for days at the time."   (Doc. 13-4 at 66). Tammy recalled that either Burton or her grandmother took care of the children when Laura was gone.   (Doc. 13-4 at 66, 68).   She explained that her grandmother and aunt "were always constant providers" for her and her siblings.   (Doc. 13-4 at 78).   In approximately 1990, Tammy moved in with her grandmother.   (Doc. 13-4 at 78).

Tameica, Butts's younger half-sister, testified that she could never depend on Laura because she was under the influence of drugs and alcohol more often than not.

---

[39] Tammy explained that she never saw anyone actually using any drugs.   However, she "saw them come out of the bathroom where they did something with … [a] Coca-Cola can."   (Doc. 13-4 at 71).   She did not "exactly know what particular drug [the can] was used for."   (Doc. 13-4 at 71).

-47-

(Doc. 13-6 at 53-54).   She stated that when Laura disappeared for days or weeks at a time, she would go to her grandmother's home, Tracy Burton's[40] home, or stay with Burton.   (Doc. 13-6 at 55, 59-62).   She recalled that after Burton moved out, various men who abused Laura spent time in the Butts's home.   However, she did not recall seeing any of these men use drugs while in the home.   (Doc. 13-6 at 55-57).   She testified that Butts cooked and helped her with homework when Laura was not at home.   (Doc. 13-6 at 58).

Johnny, Butts's uncle, described Butts as a quiet child who had no direction or guidance.   (Doc. 13-6 86).   He acknowledged that he also abused drugs and alcohol and would frequent Laura's house to drink and use drugs. (Doc. 13-6 at 83-84).   Johnny explained that when Laura was absent, he, his mother, or Burton cared for the children.   (Doc. 13-6 at 79).

Burton testified that he lived with Laura from the mid-1980's until approximately 1991 or 1992.[41]   (Doc. 13-4 at 20-21, 35).   He said Laura was addicted to crack cocaine, was frequently absent from the home for weeks at the time, and would regularly pawn household items to get drug money.   (Doc. 13-4 at 22-24).   Burton testified that he cooked, cleaned, disciplined the children, and made sure they attended school.   (Doc. 13-4 at 24-25).   DFACS records verify that he worked with the school to resolve the children's problems.   (Doc 13-7 at 18).

Burton stated that after he moved from the home, Isaac Jones moved in.   (Doc. 13-4 at 26).   Although Jones was controlling, Burton was not sure if he physically abused

---

[40]  Tracy Burton is Harold Burton's former sister-in-law.   (Doc. 13-4 at 40).

[41]  As explained previously, other witnesses testified that Burton lived with the Butts's family off-and-on until 1996.   See footnote 36 above.

Laura, and Burton did not indicate that Jones abused Butts or his siblings.   (Doc. 13-4 at 26).

Burton confirmed that Butts's grandmother and aunt helped care for the children. (Doc. 13-4 at 32).   He testified that there was always food to eat, and the children had a television, Nintendo, radios, and various toys.   (Doc. 13-4 at 32-33).   He said Laura never physically abused Butts or any of his siblings.   In fact, she did not even like to spank them.   (Doc. 13-4 at 33).

Tracy Burton, Burton's former sister-in-law, testified that Laura was a good mother before she became addicted to crack cocaine in 1986.   (Doc. 13-4 at 45, 49).   After she began using drugs, however, she "would disappear for days and weeks" at a time.   (Doc. 13-4 at 43).   During Laura's absences, Burton or the children's grandmother took care of the children.   (Doc. 13-4 at 45, 49-50).   Tracy explained that Burton made sure the children were well fed, attended school, and had clothes and toys.   (Doc. 13-4 at 49-50). She described Burton as a "great father figure" for Butts and his siblings.   (Doc. 13-4 at 43).

Two teachers, Lois Reeves and Henrietta Taylor, testified.   Reeves, who taught Butts in the second grade, described him as a nice, but sad, child who needed special attention.   (Doc. 13-4 at 9-10).   She never saw Butts's mother and thought that Butts could have done better in school if he had a better support system.   (Doc. 13-4 at 10-11). Reeves acknowledged having no contact with Butts since he left her second grade class.. (Doc. 13-4 at 14).

Taylor, who taught Butts health in the ninth or tenth grade, described Butts as quiet and respectful, but noted that he started missing class and became inattentive when he

began associating with the "wrong crowd."   (Doc. 13-3 at 129-31).   Taylor spoke with Butts and told him that she "was worried that he was headed in the wrong direction." (Doc. 13-13 at 96).   Because he was living with his grandmother at the time, Taylor expressed her concerns to Mary Frances.   (Doc. 13-3 at 130; 13-13 at 96).   Taylor acknowledged her only contact with Butts occurred during this one school year.   (Doc. 13-4 at 5).

Jan Vogelsang, a licensed "clinical social worker with expertise in conducting biopsychosocial assessments for the courts in capital cases," testified that she conducted a biopsychosocial assessment of Butts.   (Doc. 13-4 at 98).   She defined a biopsychosocial assessment as "a professional social work method of gathering extensive information across a broad spectrum of sources in an effort to … shed light on a person's behavior."   (Doc. 13-4 at 93).   Vogelsang interviewed Butts's family members; schoolteachers; a DHR caseworker; Dr. John Hagedorn (an expert on gangs); Wayne Rogers (an attorney); Dr. George Woods (a neuropsychiatrist in Oakland, California); Dr. Alex Morton (a doctor at the Medical University of South Carolina); and Dr. Jim Evans (a psychiatrist retained by Butts's state habeas counsel).[42]   (Docs. 13-4 at 99; 13-7 at 13-14).   She reviewed school records; employment records; affidavits from friends and family members; mental health and medical records of Butts, Butts, Sr., Laura, and Dominique; DHR and DFACS records; Department of Corrections and probation records; depositions; and Lower's and Stark's evaluations of Butts.   (Doc. 13-4 at 99-100). Although Vogelsang can diagnose patients, she was not asked to diagnose Butts, and she did not prepare a report or evaluation of Butts.   (Doc. 13-7 at 9, 14).

---

[42]  State habeas counsel did not call Evans to testify at the state habeas evidentiary hearing.

Vogelsang testified about Butts's family history, much of which had already been provided by other witnesses:   Laura grew up watching her mother get physically abused by her drunk stepfather (Doc. 13-4 at 114-15); Butts, Sr. grew up watching his stepfather abuse his mother, who had been diagnosed as a schizophrenic paranoid type (Doc. 13-4 at 116-17, 120); Laura dropped out of school in the ninth grade because she was pregnant and "getting in a lot of fights" (Doc. 13-4 at 115-16); Laura began drinking and was sexually promiscuous at a young age (Doc. 13-4 at 115); Butts, Sr. had a mental breakdown shortly after Butts's birth, quit his employment, and began engaging in bizarre behavior (Doc. 13-4 at 119-20); Butts, Sr. was admitted to Central State Hospital in September 1978 and diagnosed as schizophrenic paranoid type (Doc. 13-4 at 120); Butts, Sr. was admitted to Central State Hospital approximately 30 times in 16 years (Doc. 13-4 at 120); Butts, Sr. was absent from Butts's life (Doc. 13-4 at 108); Laura was a crack addict who disappeared for weeks at a time (Doc. 13-4 at 108-09); when Laura was absent, Butts had to be the primary caregiver for his brother Dominique, who was "severely mentally disturbed" (Doc. 13-4 at 109); and Laura invited a series of violent,[43] drug-abusing men in and out of the home during Butts's childhood (Doc. 13-4 at 109-10).

Voselsang testified that Butts's life grew "increasingly worse" as he progressed through childhood into adolescence.   (Doc. 13-4 at 122-23).   During his early childhood, his home was filled with turmoil, which caused him to be a sad, worried, and withdrawn child.   (Doc. 13-4 at 124-26).   During his middle childhood, Burton moved in with Laura and her children.   (Doc. 13-4 at 127-28).   Burton paid the bills, fed the children, bought the children gifts, and made sure they attended school.   (Doc. 13-4 at 129-30).

---

[43] Vogelsang testified that these men did not physically abuse Butts.   The abuse was directed at Laura. (Doc. 13-4 at 109-10).

Vogelsang testified that although Burton, their grandmother, aunt Doris, and uncle Johnny were present in their lives, the children were frequently left alone and Butts was forced to care for his younger siblings.[44]   (Doc. 13-4 at 128-29).

Vogelsang testified that Laura's relationships with Jones and Jimerson, both of whom were cruel and abusive to Laura, had a detrimental effect on Butts.   (Docs. 13-4 at 133-34; 13-5 at 1).   According to Vogelsang, Jones was involved with Laura from the time Butts was ten until he was 15.[45]   (Doc. 13-5 at 1).   When Butts was 15, Laura became involved with Jimerson, a drug dealer, who introduced Butts to guns.[46]   (Doc. 13-5 at 1).   During this time Laura was in and out of detox facilities, and Butts was forced to be the primary caretaker of Dominique, who suffered from "severe behavioral disorders" and was uncontrollable.   (Docs. 13-5 at 14-15).   According to Vogelsang, Laura started pressuring Butts to sell drugs and/or buy drugs for her.   (Doc. 13-5 at 6-7, 21).   Vogelsang opined that all of this resulted in the erosion of Butts's resilience and "[h]e just gave up."   (Doc. 13-5 at 4).   He started missing school, receiving failing grades; associating with the wrong crowd, drinking alcohol, smoking marijuana, selling crack cocaine, burglarizing homes, and carrying a gun.   (Doc.13-5 at 4-5).

Based on this, Vogelsang opined that Butts suffered from emotional abuse and neglect, which can be difficult to detect.   (Doc. 13-5 at 22-25).   She said this could

---

[44] According to Vogelsang, Tammy, as the oldest child, was initially responsible for taking care of her siblings.   (Doc. 13-4 at 129).   However, when Tammy moved out of the home and went to live with her grandmother, Butts had to become the primary caretaker of his siblings.   (Doc. 13-4 at 129).

[45] There is obviously overlap between Laura's relationship with Jones and her relationship with Burton.   If Laura dated Jones from 1987 to 1992, this is during the time Burton lived with the Butts family.   (Doc. 13-4 at 127-29).   According to Vogelsang, at some point between 1987 and 1992, Laura, not her children, moved in with Jones and he introduced her to crack cocaine.   (Doc. 13-4 at 128-29).   During this time, Butts apparently continued to live with Burton.   (Doc. 13-4 at 129).

[46] Vogelsang testified that on one occasion, Jimerson had 15 year-old Butts use a gun to threaten another man with whom Laura was spending time.   (Doc. 13-5 at 1).   However, on the questionnaire he completed for trial counsel, Butts stated that he had never even met Jimerson.   (Docs. 13-1 at 111; 15-19 at 4).

explain why DHR and DFACS caseworkers failed to remove Butts and his siblings from the home.[47]    (Doc. 13-5 at 26-27).    According to Vogelsang, Butts was not physically abused, but there were always "threats of abuse" or "threats of harm" in the home.    (Doc. 13-7 at 1-2).

On cross-examination, Vogelsang acknowledged Butts knew the difference between right and wrong, yet he chose to hang around the wrong people, violate the conditions of his probation, drink alcohol, and use drugs.    (Doc. 13-7 at 41-43, 47). Vogelsang also acknowledged that Stark diagnosed Butts as having an antisocial personality disorder, and Lower found he had a "longstanding personality disorder," the characteristics of which were "poor judgment, impulse control, disregard for social mores, inability to form close relationships or become involved in others."    (Doc. 13-7 at 46-47).

State habeas counsel also tendered affidavits from childhood friends, family members, teachers, and a guidance counselor stating that Butts was intelligent, well-mannered, sensitive, lonely, nice, quiet, pleasant, polite, friendly, and nonaggressive.    (Doc. 13-13 at 76, 85, 88, 89, 95, 96; 13-14 at 3).

The state habeas court found "[e]ven if this Court were to determine that the failure to present evidence of [Butts's] background and home life … constituted deficient performance on the part of either trial or appellate counsel, the Court finds no prejudice: there is a not a reasonable probability that the result of the trial or appeal would have been different if such evidence had been presented at either stage."    (Doc. 16-23 at 45-46).

---

[47]    Celia Cooper, a former child protective services worker with DFACS in Baldwin, Wilkinson, and Fulton Counties, testified "generally about some of the DFACS policies" in Baldwin County.    (Doc. 13-3 at 119). She explained that case workers are assigned to handle a large number of cases each month and it is difficult to substantiate emotional abuse or neglect.    (Doc. 13-3 at 119-20).    Also, it is a lengthy and tedious process to remove a child from a neglectful or abusive home.    (Doc. 13-3 at 119-25).    However, Cooper had absolutely no recollection of Butts or his family.    (Doc. 13-3 at 119).

The court also determined that Butts did not establish he was prejudiced by trial counsel's failure to hire a mitigation expert.   (Doc. 16-23 at 35 n.9).   Butts argues the state habeas court's decision was unreasonable because the court "failed to weigh the new mitigating evidence against the original aggravating evidence."   (Doc. 24 at 100).   He also maintains that the court's decision is "unreasonable substantively, as no reasonable jurist could deny a reasonable probability that the powerful new mitigating evidence could have altered the outcome."   (Doc. 24 at 101).

Contrary to Butts's assertion, the state habeas court did not fail to "reweigh the evidence in aggravation against the totality of available mitigating evidence."   *Wiggins*, 539 U.S. at 534.   The court provided a detailed analysis of the evidence presented at the state habeas evidentiary hearing.   (Doc. 16-23 at 35-46).   The court determined that the testimonial and documentary evidence presented showed that Laura was frequently absent from her children's lives and used drugs; Butts, Sr. was mentally ill and had no role in Butts's life, and Butts's younger brother Dominique had behavioral problems.   (Doc. 16-23 at 36-37).   It also found that trial counsel knew all this prior to trial.   (Doc.16-23 at 33).   The record supports these findings.

The state habeas court also found that Vogelsang, Butts's mitigation expert, testified about four significant influences in Butts's life:   his mentally-ill father; his drug-abusing, alcoholic, and neglectful mother; his mentally disturbed younger brother; and the use and sale of drugs by Laura's various boyfriends.   (Doc. 16-23 at 36).   The court determined that Vogelsang's testimony was undermined or contradicted in several respects:

- Vogelsang was not licensed in the State of Georgia, and she was not a licensed medical doctor, psychologist, or psychiatrist[48] (Doc. 16-23 at 36);

- When performing her biopsychosocial assessment, she never spoke with Lower or Stark, the psychologists who examined Butts prior to trial, or Nancy Bowers, the school social worker who Vogelsang acknowledged "had an enormous amount of contact with the family"[49] (Doc. 16-23 at 36);

- Although she concluded Butts, Sr.'s mental illness may somehow mitigate Butts's sentence and a large portion of her presentation and evidence concerned his mental illness, Butts's last contact with Butt's, Sr. occurred when he was approximately one year old;[50] (Doc. 16-23 at 36-37);

- While Voglesang testified that ten-year-old Butts was left home alone to be the primary care-taker of his "severally mentally handicapped younger brother,"[51] numerous witnesses testified and documentary evidence showed that Butts's grandmother, aunt, uncle, and Burton took care of Butts and his siblings while their mother was absent[52] (Doc. 16-23 at 37-39); and

---

[48] Butts argues this is the "wrong standard" because "[a] mitigation expert does not need to be licensed as a medical doctor, psychologist, or psychiatrist in order to testify." (Doc. 24 at 110). The state habeas court did not find that Vogelsang could not testify, and it did not completely discount her testimony because she was not a doctor, psychologist, or psychiatrist. Her credentials were just one factor the state habeas court considered when it determined that there was not a reasonable probability that her testimony would have resulted in a different sentence for Butts. *See Sears v. Upton*, 561 U.S. 945, 949 (2010) (noting that the petitioner's expert was a "well-credentialed" psychologist).

[49] Again, Butts argues this is the "wrong standard," and these facts should simply have been used as a basis for cross-examination. (Doc. 24 at 110). Butts's point is not at all clear; they were used as a basis for cross-examination. (Doc. 13-7 at 12-13). On direct, Vogelsang testified that she gathered "extensive information across a broad spectrum of sources in an effort to … shed light on [Butts's] behavior." (Doc. 13-4 at 93). On cross-examination, she admitted that she did not speak with two psychologists who evaluated Butts prior to trial or Bowers, a social worker who was very familiar with the Butts's family. (Doc. 13-7 at 12-13). Vogelsang acknowledged that she thought "it was very important to get with" Bowers, but she was unable to do so despite making "every effort." (Doc. 13-7 at 13). It was appropriate for the state habeas court to consider her failure to speak with these three individuals, all of whom unquestionably had insight into Butts and/or his family. Her failure goes toward the weight a jury—or motion for new trial or an appellate court—may have given Vogelsang's testimony.

[50] Butts argues this was an unreasonable factual finding. However, Laura testified that she left Butts, Sr. approximately 11 months after Butts was born and neither she, nor Butts, had any contact with him after that. (Doc. 13-6 at 110, 129).

[51] While Vogelsang variously described Dominique as "profoundly disturbed," "severely emotionally disturbed," or "severely mentally handicapped," his initial diagnosis was "minimal brain damage," which was the original term for Attention Deficient Hyperactivity Disorder ("ADHD"). (Docs. 13-4 at 133; 13-5 at 11, 14, 31-32, 36). He was later diagnosed as having ADHD and a conduct disorder. (Doc. 13-7 at 31). Despite these behavioral or conduct disorders, both Bowers and Vogelsang said he was actually a "bright boy." (Doc. 13-7 at 33).

[52] Tammy testified that her grandmother and aunt "were always constant providers" for her and her siblings. (Doc. 13-4 at 78). Tameica testified that Burton or her grandmother kept them when her mother was

- Vogelsang was completely unaware of the facts of the crime Butts was convicted of committing because she "did not go into it."    (Docs. 13-7 at 47).

Notably, Vogelsang's assertions that Butts suffered from emotional abuse, neglect, and abandonment while he lived in an "unsettled home" under a "constant threat of harm or constant threat of violence" were undercut by testimony from Nancy Bowers, who worked with Dominique from 1991 to 1993 while she was employed as a parent worker or social worker with the Oconee Psychoeducational Program.    (Docs. 13-5 at 36; 13-6 at 143; 13-12 at 46-47, 53).    Bowers testified that DFACS investigated the Butts family but did not remove the children because they were not "in any immediate danger." (Docs. 13-13 at 21; 14-29 at 68-72).    She recalled that Butts's grandmother, aunt, and Burton provided financial support and helped take care of the children when Laura was absent or unable to care for them.    (Doc. 13-12 at 70, 72-74, 77).    Bowers testified:

> [T]hat's my memory, that there was a lot of family support.    And that's what we expect when we see an adult, a parent struggling, that family usually steps in.    And that's what we want because we don't want children in foster care.    We want the family to come in and support the children and give them what they need short of their own mother being able to do it or their parents.
>
> And so, that's what we saw a lot going on in this family.    That if she wasn't

---

absent.    (Doc. 13-6 at 55, 60-61).    Johnny Waller, Butts's uncle, testified that he, his mother, or Burton cared for the children when Laura was absent.    (Doc. 13-6 at 79).    Burton testified that he cared for the children when Laura was not there and he acknowledged that Butts's grandmother and aunt helped care for them.    (Doc. 13-4 at 24-25, 32).    Tracy Burton testified that Burton or the children's grandmother took care of them while Laura was away.    (Doc. 13-4 at 45, 50).    Butts's former ninth grade teacher, Taylor, testified that when Butts was in her class, he was living with his grandmother.    (Doc. 13-3 at 130).    Records obtained by trial counsel and submitted during the state habeas evidentiary hearing verified that other family members or Burton cared for the children while Laura was away.    For example, records from the Oconee Psychoeducational Center dated June 16, 1992 showed that his grandmother and uncle were "quite involved with Dominque."    (Doc. 14-29 at 46).    These records described Burton as Laura's fiancé, a "father figure," and a person who provided "great assistance to the school" when school officials were unable to locate Laura.    (Doc. 14-29 at 45-48).    DFACS records dated November 16, 1993 showed that Laura and her children live with her fiancé; "[t]he home is adequate"; "[t]he family seems to function well"; and Laura has support from "her fiancé, other relatives, and numerous community resources."    (Doc. 14-23 at 73).    Additionally, Butts told trial counsel that he spent a considerable amount of time with his grandmother and she helped raise him.    (Doc. 15-19 at 5).

there, and I don't recall her being gone that much, but I do think that she had some rehab issues and -- relapse issues, rather.

(Doc. 13-13 at 41-42).   Bowers explained, "I think we felt very comfortable that the family was taking care of the kids.   And believe you me, I'm an old DFACS worker, so if I had any concern, I would have called that in.   But I don't recall worrying about it at all."   (Doc. 13-12 at 73).

Baldwin County DFACS, DHR, and the Oconee Psychoeducational Program Records from 1993 and 1994[53] substantiate Bower's recollection.   These agencies investigated allegations of possible sexual abuse[54] and medical negligence[55] regarding Dominique.   (Doc. 14-23 at 41).   When DFACS representatives visited the family in June 1993, December 1993, January 1994, and February 1994,[56] the house was clean, the children were being cared for, and "things looked just fine."   (Docs. 13-7 at 27-29; 14-23 at 68-69, 81, 86).   DFACS records from a May 31, 1994 "unannounced" visit and a June 23, 1994 visit[57] showed Laura was present in the home, as were all of her children, Dominique's prescriptions had been filled, and the house was clean.   (Docs. 13-7 at 29-30; 14-23 at 88).   On June 29, 2004, Bowers reported that Laura had failed to fill Dominique's prescriptions only once in the past year and "she didn't think that was reason for concern."   (Doc. 14-23 at 89).   Thus, the case was closed.   (Doc. 14-23 at 89-90).

---

[53]  Trial counsel had obtained all of these records.   (Docs. 13-1 at 16-17; 14-18 to 14-23; 14-29 at 1 to 14-30 at 6).

[54]  It was alleged that Dominique might have been sexually abused when he visited his paternal aunt's home.   (Doc. 14-23 at 63, 67).   It was determined that the sexual abuse allegations were "unfounded" and the case was closed on July 2, 1993.   (Doc. 14-23 at 38, 72).

[55]  Bowers notified DFACS that Laura was not giving Dominique his ADHD medication as prescribed. (Doc. 14-23 at 41-42, 77).

[56]  These visits were "announced," meaning that prior to the visit, Laura was told when a representative from DFACS would be coming to the home.   (Doc. 13-7 at 29).

[57]  It is not clear if this visit was "announced" or "unannounced."   (Doc. 14-23 at 88).

The state habeas court also considered the testimony of Butts's former teachers. (Doc 16-23 at 40).   The court noted that while Reeves testified Butts appeared "sad" when he was in her class, she had not seen him since he was in the second grade—13 years before his trial.   (Doc. 16-23 at 40 n.20).   Also, there was nothing in Butts's school records from that time which suggested any concern about Butts.   (Doc. 16-23 at 40-41 n.20).   Taylor, his ninth grade teacher, testified that Butts started missing school, was always tired, and began hanging around the wrong crowd.   (Doc. 16-23 at 40). Although this led Vogelsang to conclude that Butts's dysfunctional home life finally "wore him down," she acknowledged that another interpretation of Taylor's testimony is that when Butts got a car, he made the choice to skip school, hang around with gang members, use and sell drugs, drink alcohol, steal, and carry concealed weapons.   (Doc. 13-7 at 38-40).   His choice to engage in such behavior, as opposed to any dysfunction occurring at home, could have led him to perform poorly in school.   (Doc. 13-7 at 42-43). Clearly, the state habeas court could reasonably find that Taylor's testimony would not, with any reasonable probability, have changed the outcome.   (Doc. 16-3 at 41).

In conclusion, the state habeas court did not fail to analyze the effect of the new mitigating evidence and reweigh it against the evidence in aggravation.   Nothing in the state habeas court's opinion indicates it "discount[ed] entirely the effect" that the new evidence, including Vogelsang's testimony, would have had on the jury.   *Porter*, 558 U.S. at 43.   Instead, the court determined that had the jury heard all of the new evidence, there is no reasonable probability they would have given Butts a different sentence. After a thorough review of the record, the Court is unable to say that no reasonable jurist could agree with the state habeas court's prejudice determination.

f.  Supreme Court precedent

Butts acknowledges that *Strickland* is the "clearly established Federal Law"
governing the disposition of ineffective assistance of counsel claims.   28 U.S.C. § 2254
(d)(1); (Doc. 24 at 19).   He argues, however, that the state habeas court's decision
cannot be squared with *Strickland's* holding as the Supreme Court has applied the
holding in several later cases:   *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*,
539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558
U.S. 30 (2009); and *Sears v. Upton*, 561 U.S. 945 (2010).[58]   The Court notes initially that

---

[58] Butts also relies on several decisions from the Eleventh Circuit:   *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir.
2011); *Johnson v. Sec'y, DOC*, 643 F.3d 907 (11th Cir. 2011); and *Williams v. Allen*, 542 F.3d 1326 (11th
Cir. 2008).   These cases are factually distinguishable.   In *Ferrell*, it was apparent that Ferrell had mental
health problems, but trial counsel failed to learn of his severe organic brain damage, bipolar disorder, and
temporal lobe epilepsy because they never asked any of his family members about his mental health and
unreasonably told their mental health expert to determine only if Ferrell was mentally retarded or if he had
any problems that affected the waiver of rights he signed before giving statements to the police.   *Ferrell*,
640 F.3d at 1203, 1227-28.   There is no contention that Butts suffers from brain damage or other serious
mental disorder about which his trial counsel failed to learn, or that trial counsel unreasonably limited the
scope of Butts's psychological evaluation.   Ferrell's trial counsel spoke with potential witnesses, other than
Ferrell's parents, only after the guilt phase of the trial and they failed to learn that Ferrell's father regularly
beat him with whips and straps, that he and his family were repeatedly evicted from their homes, and that he
often went without food.   *Id.* at 1230.   Here, trial counsel, well in advance of trial, spoke with numerous
witnesses, reviewed various records, and had Butts examined by a psychologist.   They knew Butts's father
was mentally ill and absent from his life, his mother was a neglectful alcoholic who abused drugs, he was
cared for by his grandmother and aunt, his younger brother had a conduct disorder, and he did well in
school until the ninth or tenth grades.   In *Ferrell*, trial counsel testified that they chose to use a residual
doubt strategy, but they did not present evidence of such or argue residual doubt to the jury.   *Id.* at 1123.
Here, trial counsel presented evidence and argument supporting their residual doubt strategy.   In *Johnson*,
trial counsel waited until "the eleventh hour" to begin their mitigation investigation.   *Johnson*, 643 F.3d at
932.   Faced with overwhelming evidence of guilt and having been told by Johnson that he was abused by
his alcoholic father, trial counsel still waited until after the guilt stage of Johnson's trial was over to attempt to
investigate mitigating circumstances.   *Id.*   Johnson's trial counsel could not explain why he failed to talk to
Johnson's friends or family members, "other than the obvious fact that he had waited too late to start
investigating his client's background."   *Id.* at 933.   That clearly did not happen here.   In *Williams*, trial
counsel's sentencing phase preparation consisted of three sources:   speaking only with Williams's mother,
obtaining a psychological evaluation, and reviewing a pre-sentence investigation report.   *Williams*, 542
F.3d at 1339.   Williams's trial counsel's sentencing phase strategy "focused on establishing that Williams
had a troubled background," so "they had every incentive to develop the strongest mitigation case
possible."   *Id.* at 1340 (citing *Wiggins*, 539 U.S. at 526).   "It thus is apparent that counsel's failure to
expand their investigation 'resulted from inattention, not reasoned strategic judgment.'"   *Id.* (quoting
*Wiggins*, 539 U.S. at 526).   Again, that did not happen here.   Additionally, the mitigating evidence
uncovered in *Williams* far exceeds anything presented during the state habeas proceeding in Butts's case:
Williams suffered severe beatings several times a week, his father physically assaulted him with "deadly
weapons," his mother beat him with belts and "other instruments," he was left unsupervised and allowed to

"[t]hese cares are … relevant only to the extent they might demonstrate that [Butts's] counsel, confronted with circumstances like those presented at the time and place of [Butts's] trial, failed to adhere to the standard of reasonable representation." *Anderson v. Sec'y, Fla. Dep't of Corr.,* 752 F.3d 881, 904 (11th Cir. 2014). The Supreme Court has faulted lower courts for reading these cases to establish "a 'constitutional duty to investigate' capital cases in a particular, prescribed way." *Id.* at 906 (quoting *Pinholster,* 131 S.Ct. at 1406). They do not create any "mechanistic rule[s] of law at all for investigation or for presentation of evidence in capital cases." *Chandler,* 218 F.3d at 1317 n.21. Nor can any of these cases "command the outcome for this case" because the facts here are "materially different, allowing for different outcomes under *Strickland.*" *Id.*

Butts claims the state habeas court's decision is "contrary to" *Williams* because "the state habeas court confronted a set of facts 'materially indistinguishable' from those in *Williams*, and yet reached the opposite result." (Doc. 24 at 115). The Court disagrees. In *Williams*, trial counsel did not start preparing for the sentencing phase until one week prior to trial and "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams's nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Williams*, 529 U.S. at 395. Counsel failed to discover records showing Williams had been "severely and repeatedly beaten by his father," his parents were imprisoned for two years for criminal neglect of Williams and his siblings, and, during their incarceration, Williams was forced to endure an abusive foster home. *Id.* There

---

roam the streets alone at ages four or five; he did not have adequate food to eat or clothes to wear, and he did not receive adequate medical attention for serious injuries. *Id.* at 1331-34.

clearly was no such failure in Butts's case.   As discussed, Butts's trial counsel conducted a timely, reasonable investigation into his background and obtained most, if not all, of the records that were tendered to the state habeas court.

As for prejudice, the Virginia Supreme Court in *Williams* read *Lockhart v. Fretwell*, 506 U.S. 364 (1993), "to require a separate inquiry into fundamental fairness even when Williams [was] able to show that his lawyer was ineffective and that his ineffectiveness probably affected the outcome of the proceeding."   *Williams*, 529 U.S. at 393.   This was unreasonable.   *Id.* at 393-94.   So was the Virginia Supreme Court's failure to consider that mitigating evidence unrelated to future dangerousness might have "alter[ed] the jury's selection of penalty, even if it [did] not undermine or rebut the prosecution's death-eligibility case."   *Id.* at 393-94, 398.   The state habeas court committed no such errors in Butts's case.   Instead, it considered all the mitigating evidence presented and, applying the correct *Strickland* prejudice test, determined that there was "not a reasonable probability that the result of the trial or appeal would have been different if such evidence had been presented at either stage."   (Doc. 16-23 at 45-46).

*Wiggins* is also distinguishable.   There, trial counsel had a presentence investigation report that showed Wiggins spent most of his childhood in foster care, noted his "misery as a youth," and quoted him as saying his background was "disgusting." *Wiggins,* 539 U.S. at 523.   They also had records revealing that Wiggins's mother was a chronic alcoholic; he was moved from one foster home to another; he had emotional difficulties; he had frequent, lengthy absences from school; and his mother left him and his siblings at home alone for days without food.   *Id.* at 525.   Notwithstanding this information, trial counsel did no further investigation into Wiggins's background.   *Id.* at

-61-

526.   The Supreme Court held that trial counsel's limited investigation was unreasonable in light of what the records actually revealed.   *Id.* at 525, 527.   Because Wiggins's trial counsel abandoned their investigation at an "unreasonable juncture" they necessarily failed to make a fully informed decision regarding their sentencing strategy.   *Id.* at 527. Again, there is no indication that Butts's trial counsel prematurely abandoned their investigation.   As discussed above, they spoke with numerous witnesses and obtained records (again, essentially the same records state habeas counsel got), through which they learned Butts's life history.

Moreover, in *Wiggins*, trial counsel told jurors they were "'going to hear that … Wiggins has had a difficult life.'"   *Id.* at 515.   But they presented "no evidence of Wiggins's life history."   *Id.*   In contrast, Butts's trial counsel made a considered decision to focus on residual doubt after they investigated Butts's background and they pursued this theory during both the guilt and sentencing phases of Butts's trial.

Also, the prejudice to Wiggins resulting from trial counsel's ineffectiveness was plain.   Evidence presented at Wiggins's post-conviction hearing showed:   he and his siblings often had to beg for food or eat paint chips and garbage when their alcoholic mother left them home alone for days; his mother had sex with men while the children slept in the same bed; his mother beat him for breaking into the kitchen, which she kept locked; his mother once forced Wiggins's hand against a hot stove burner, burning him so badly he had to be hospitalized; after he was placed in foster care, at age six, the first and second foster mothers physically abused him, and he was repeatedly raped and molested by the father in the second foster home; in a later foster home setting he was "gang-raped . . . on more than one occasion"; and when he entered the Job Corps

-62-

program, he was sexually abused by his supervisor.    *Id.* at 517.    Obviously, the

mitigating evidence introduced at Wiggins's post-conviction proceeding was much more

compelling than the evidence Butts presented during his state habeas evidentiary

hearing.    *Grayson v. Thompson*, 257 F.3d 1194, 1230 n.20 (11th Cir. 2001) (noting that

*Williams* was "easily distinguished," in part, because the mitigating evidence presented in

*Williams* was "far more compelling" than that presented by Grayson).

Finally, no state court had decided whether Wiggins was prejudiced by his

counsel's failures, and, therefore, the federal court decided this issue without the

constraint of AEDPA deference.    *Wiggins*, 539 U.S. at 534.    This Court is

"circumscribed by a state court conclusion with respect to prejudice."    *Id.*    The Court can

grant relief only if it finds no fairminded jurist could agree with state habeas court's

conclusion that Butts was not prejudiced by trial or appellate counsel's failure to introduce

the testimonial and documentary evidence presented during the state habeas evidentiary

hearing.    This Court cannot make such a finding.

In *Rompilla*, the Supreme Court held trial counsel were ineffective because they

failed to examine a readily available file that contained information about Rompilla's prior

conviction for rape and assault when trial counsel knew the prosecutor was going to use

the prior conviction as an aggravating factor in seeking a death sentence.    545 U.S. at

383.    There is no allegation of a similar failure here.    *Rompilla* is inapposite.

In *Porter*, no state court had decided whether trial counsel's performance was

deficient, so the Supreme Court reviewed that element of his *Strickland* claim *de novo*

rather than with AEDPA deference.    558 U.S. at 39.    In any event, the facts of Porter

bear no similarity to the facts here.    Porter's trial counsel had only one meeting with

-63-

Porter prior to sentencing and "did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family." *Id.* Trial counsel "did not even take the first step of interviewing witnesses or requesting records." *Id.* (citing *Van Hook*, 130 S. Ct. at 18-19). It cannot be seriously argued that trial counsel's conduct in Butts's case is analogous to the conduct held to be ineffective in *Porter*.

Finally, in *Sears*, the state habeas court found that trial counsel's investigation into mitigating evidence was "'on its face . . . constitutionally inadequate'" because he spent only a "day or less[,] talking to witnesses selected by [Sears's] mother." *Sears,* 561 U.S. at 952 (citations omitted). Having found deficient performance, the state habeas court committed two errors in its prejudice analysis: (1) it unreasonably assumed trial counsel's theory—how a death sentence would impact his family—was reasonable; and (2) it expressly refused to conduct the *Strickland* prejudice analysis because trial counsel had presented some evidence during sentencing. *Id.* at 953-54.

The state habeas court here committed no such errors. It found that trial counsel conducted a reasonable investigation and then made a reasonable strategic decision to present a mitigation theory of residual doubt. (Doc. 16-23 at 19-33, 41-43). Also, unlike the state court in *Sears*, it did not find a lack of prejudice simply because trial counsel presented some mitigating evidence. Instead, it considered all of the mitigating evidence presented both at trial and during state habeas proceeding and reweighed it against the evidence in aggravation before deciding that there was no reasonable probability that the additional testimony would have changed the outcome of Butts's sentence. (Doc. 16-23 at 35-41, 45-46). This is the appropriate *Strickland* prejudice analysis.

-64-

-65-

g.  Conclusion

When evaluating appellate counsel's effectiveness, the state habeas court properly analyzed Butts's claim that trial counsel were ineffective for failing to investigate, develop, and present evidence of Butts's background.   Having found that appellate counsel performed deficiently, the state habeas court assumed that effective appellate counsel would have introduced all the evidence presented at the state habeas evidentiary hearing.   (Doc. 16-23 at 17-18).   Applying *Strickland*, the court considered this evidence and concluded there was no reasonable probability that the motion for new trial or appeal would have ended differently.   (Doc. 16-23 at 18).   In other words, had appellate counsel presented the same evidence that state habeas counsel did, there was not a reasonable probability they could have established that trial counsel's performance was deficient or that Butts was prejudiced.   This Court finds the state habeas court's determinations were not contrary to and did not involve an unreasonable application of *Strickland*, nor were they based on any unreasonable factual determinations.   Thus, the Court must deny relief on this claim.

.  .  .  .